IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DAVON LYMON,

       Plaintiff,

vs.                                                                No. CIV 08-0386 JB/DJS

ARAMARK CORPORATION, JOSEPH NEUBAUER,
CHARLIE CARRIZALES, WEXFORD CORPORATION,
JOHN SANCHEZ IN HIS OFFICIAL CAPACITY
AND INDIVIDUAL CAPACITY, ABNER HERNANDEZ
IN HIS OFFICIAL AND INDIVIDUAL CAPACITY,
JOE WILLIAMS as SECRETARY
OF THE NEW MEXICO DEPARTMENT
OF CORRECTIONS IN HIS INDIVIDUAL
AND OFFICIAL CAPACITY, and the NEW MEXICO
DEPARTMENT OF CORRECTIONS,

       Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the State Defendants' Rule 12(b) Motion to

Dismiss, filed February 19, 2010 (Doc. 79).   The Court held a hearing on May 19, 2010.

The primary issues are: (i) whether Lymon has asserted any constitutional claims against Defendants

John Sanchez, Abner Hernandez, Joe Williams, and the New Mexico Department of Corrections

("NMDOC")(collectively "the State Defendants") upon which the Court can grant relief; and

(ii) whether Plaintiff Davon Lymon has asserted valid waivers of immunity for his negligence claims

under the New Mexico Tort Claims Act, NMSA 1978, §§ 41-4-1 through 41-4-27 ("NMTCA"),

against the State Defendants.   Because Lymon fails to state constitutional claims upon which the

Court can grant relief, the Court will dismiss the constitutional claims in Counts V, VI, VII, VIII,

XIII, and XIV asserted against the State Defendants.   Because the Court finds that no waivers of

immunity apply to Lymon's NMTCA claims, the Court will also dismiss Counts I, II, III, and IV. The Court will therefore grant the State Defendants' Rule 12(b) Motion to Dismiss and dismiss the State Defendants from the case.

## FACTUAL BACKGROUND

At all times relevant to the Second Amended Complaint, Lymon was an inmate at the Central New Mexico Correctional Facility in Los Lunas, Valencia County, New Mexico. See Plaintiff Davon Lymon's Second Amended Complaint for Negligence, Bodily Injury and Claims Under 42 U.S.C. Sections 1983 and 1985 ¶ 1, at 1, filed December 14, 2009 (Doc. 69) ("Second Am. Complaint").  At all relevant times, Sanchez was a NMDOC corrections officer, Hernandez was a NMDOC captain, and Williams was the Secretary of NMDOC.  See Second Am. Complaint ¶¶ 2-4, at 2.  According to the Second Amended Complaint, Defendant Aramark Corporation managed the prison kitchen at the Central New Mexico Correctional Facility, and Defendants Bertha Benavidez and Charlie Carrizales were employees of Aramark working in the prison kitchen.  See Second Am. Complaint ¶¶ 5-6, at 2.

Lymon alleges that he had a pre-existing injury to his left shoulder rotator cuff and did not receive a medical clearance before being assigned to work in the prison kitchen.  See Second Am. Complaint ¶ 2, at 1.  He alleges that, on September 23, 2004, a prescription was placed in his medical records, stating that he was prohibited from lifting objects with his left arm.  See Second Am. Complaint ¶ 13, at 3.  He also alleges that Nurse Jessica Garcia issued a prison health services pass/lay-in slip prohibiting him from lifting objects.  See Second Am. Complaint ¶ 14, at 3.  Lymon alleges that Salazar, a prison classification officer, classified Lymon to work in the prison kitchen. See Second Am. Complaint ¶ 10, at 3.

Lymon's claims, according to his Second Amended Complaint, arise out of events that

occurred on July 3, 2005.  He alleges that, on July 3, 2005, at 1:00 p.m., Benavidez assigned back-porter work to Lymon, which involved frequent heavy lifting.  See Second Am. Complaint ¶ 16, at 4.  Lymon alleges that, while lifting heavy trays in the dish room, his shoulder gave out, causing him to slip and fall, and causing him severe pain for which he sought medical care.  See Second Am. Complaint ¶ 17, at 4.  He alleges damages arising out of the injuries he sustained.  See Second Am. Complaint at 20.

## PROCEDURAL BACKGROUND

Lymon's case was originally filed pro se in state court on August 26, 2005, alleging damages arising out of injuries he sustained from work that he was required to do in the prison kitchen while an inmate at the Central New Mexico Correctional Facility in Valencia County, New Mexico. See Complaint (Doc. 1-4).  Counsel for Lymon, Solomon Brown, first appeared for Lymon in the case in state court on September 5, 2007.  The case was removed to federal court on April 14, 2008.

On February 9, 2009, the Court granted Lymon's first motion to amend his complaint. See Memorandum Order and Opinion, filed February 4, 2009 (Doc. 22).  On April 23, 2009, Lymon filed an opposed motion to file a second amended complaint, which would add twenty-one inmates to the complaint either as a class action pursuant to rule 23 of the Federal Rules of Civil Procedure or using rule 20 joinder.  See Plaintiff Davon Lymon's Opposed Motion to File a Second Amended Complaint, filed April 23, 2009 (Doc. 35).  The Court held a hearing on July 13, 2009, instructed Lymon that he needed to decide whether to proceed under rule 23 or rule 20, and denied his motion without prejudice.[1]  On July 24, 2009, Lymon filed a Motion for Reconsideration of the Court's Denial of his Opposed Motion to File a Second Amended Complaint Adding Wexford Corporation

---

[1] The Court memorialized its instruction to Lymon at the hearing in its Memorandum Opinion and Order, filed October 7, 2009 (Doc. 59).

as a Defendant.  See Doc. 47.[2]  The motion for reconsideration was unopposed, and the Court

granted Lymon leave to add Wexford Corporation as a defendant.  See Order, filed December 12,

2009 (Doc. 67).  Lymon also filed another motion for reconsideration, requesting class certification

under rule 23 and abandoned his earlier request to join additional plaintiffs under rule 20.[3]

See Plaintiff Davon Lymon's Reconsideration Motion to File a Second Amended Complaint for

Class Certification, filed July 25, 2009 (Doc. 49).  The Court denied the motion to amend and add

a class action, finding such an amendment would be futile and would prejudice the Defendants.

See Memorandum Opinion and Order, filed December 12, 2009 (Doc. 68).

### 1.      Lymon's Second Amended Complaint.

Lymon filed his Second Amended Complaint on December 14, 2009.  See Doc. 69.  The

Second Amended Complaint contains fifteen counts.  Counts I through VIII, XIII, and XIV are

asserted against either all Defendants, or against one or more of the State Defendants.  Counts V

through XIV assert federal constitutional claims.  Count V is a § 1983 claim against the State

Defendants for violations of the Fourteenth Amendment, alleging that the State Defendants deprived

Lymon of his liberty interest in protection from abuse of inmate labor.  See Second Am. Complaint

¶ 36-43, at 9-11.  Count VI alleges violations "of civil rights Section 42 U.S.C. 1981 through Section

_____

[2] Lymon also filed an affidavit on July 24, 2009, following the filing of his motion for
reconsideration.  See Affidavit of Davon Lymon (executed July 22, 2009), filed July 24, 2009
(Doc. 48)("Lymon Aff.").  In his affidavit, Lymon discusses Wexford and states: "I have hepatitis C.
The Wexford medical clinic follow-up has not kept me aware of whether this condition is active or
dormant on a continuous basis."  Lymon Aff. ¶ 5, at 2.  The affidavit does not state when or how
Lymon contracted hepatitis C.

[3] In the proposed second amended complaint, Lymon asserted a claim for "prospective relief
in form of prohibiting of the practice of having tatoos [sic] within prison grounds; and mandating
medical clearance for inmates assigned kitchen duty; mandating periodic inspections of the inmate
kitchen."  See Plaintiff Davon Lymon's Reconsideration Motion to File a Second Amended
Complaint for Class Certification at 20.

1983," and alleges that the Defendants[4] intended to harm Lymon because of his race.  Second Am. Complaint ¶¶ 44-50, at 11-13.  Count VII is a § 1983 claim asserted against Williams for violations of Lymon's Fourteenth Amendment rights, alleging that Williams ignored the substandard food and services that Aramark provided.  See Second Am. Complaint ¶¶ 51-56, at 13-14.  Count VIII is a § 1983 claim for violations of the Fourteenth Amendment asserted against NMDOC, alleging that it had a custom or policy of allowing classification officers to misclassify inmates, and failed to train corrections officers how to deal with healthcare precautions involving food preparation.  See Second Am. Complaint ¶¶ 57-59, at 14.  Count XIII asserts an infliction-of-involuntary-servitude claim in violation of the Thirteenth and Fourteenth Amendments, alleging that the Defendants' conduct in ordering Lymon to do work had the indices of slavery.  See Second Am. Complaint ¶¶ 76-80, at 18-19.  Count XIV asserts that Sanchez' classification of prisoners represented a threat to public health.  See Second Am. Complaint ¶¶ 81-83, at 19.

Counts I through IV assert state claims under the NMTCA. Count I asserts claims under the NMTCA of negligence and personal injury that Sanchez caused.  Lymon alleges that Sanchez negligently classified Lymon to work in the kitchen.  See Second Am. Complaint ¶¶ 19-24, at 4-6. Count II asserts claims under the NMTCA of negligence and personal injury that Hernandez caused, alleging that Hernandez denied Lymon the use of the prison grievance process.  See Second Am. Complaint ¶¶ 25-29, at 5-7.  Count III against Williams and Count IV against NMDOC allege claims of negligence and *respondeat superior* because Williams and NMDOC allegedly failed to train corrections officers, failed to monitor private contractors, and maintained a policy of disallowing

---

[4] It is unclear from the Second Amended Complaint whether Count VI has been asserted against all Defendants, only the State Defendants, or the State Defendants and Aramark, but not Wexford.

grievance appeals where inmates are injured while working for private contractors.  <u>See</u> Second Am. Complaint ¶¶ 30-35, at 7-9.

Counts IX, X, XI, and XII, against Aramark, Neubauer,  Carrizales, and Benavidez ("the Aramark Defendants"), allege § 1983 violations of the Fourteenth Amendment (Counts IX, X, and XI) and claims for intentional infliction of emotional distress (Count XII). <u>See</u> Second Am. Complaint ¶¶ 60-75, at 14-18.  Count XV is asserted against Wexford and alleges deliberate indifference to Lymon's medical condition.  <u>See</u> Second Am. Complaint ¶¶ 84-88, at 20. Counts IX, X, XI, XII, and XV are not at issue in the State Defendants' motion to dismiss.

### 2.      <u>State Defendants' Motion to Dismiss.</u>

The State Defendants move the Court, pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the claims asserted against them in Lymon's Second Amended Complaint. The State Defendants thus take no position with respect to Counts IX, X, XI, XII, or XV.  The State Defendants seek dismissal with prejudice of all counts brought against them, arguing that all the relevant Counts fail to state a claim upon which the Court can grant relief.  The State Defendants also argue that Lymon lacks standing to bring the claims in Counts VII, VIII, and XIV.  The State Defendants further argue that the individual State Defendants are entitled to qualified immunity.

### a.      **The Federal Constitutional Claims.**

The States Defendants argue that Lymon has failed to state any federal constitutional claims against them.  Specifically, the State Defendants argue that the Court should dismiss Count V, because Lymon's Second Amended Complaint fails to allege a protected liberty or life interest that the State Defendants violated.  <u>See</u> Motion at 18-20.  The State Defendants further argue that the Court should dismiss Count VI, because Lymon's allegation do not support the existence of any enforceable contract between Lymon and anyone else, and accordingly, they argue, his equal

contracting rights under 42 U.S.C. § 1981 could not have been violated.  <u>See</u> Motion at 21. The State Defendants also argue that the Court should dismiss Counts VII and VIII because they assert claims about substandard food preparation and kitchen services, which are not related to Lymon's injuries to his shoulder after heavy lifting in the prison kitchen, and thus he fails to allege injury-in-fact necessary for standing.  <u>See</u> Motion at 22.  <u>See</u> Motion at 23-24.  Further, the State Defendants contend that Lymon lacks standing to bring Counts VII and VIII because they assert general grievances appropriately addressed in the representative branches, and not in this Court.  <u>See</u> Motion at 24-25.

With respect to Count XIII, which alleges Lymon was forced to do work in prison against his will in violation of the Thirteenth Amendment, the State Defendants argue that the Thirteenth Amendment provides an exception for punishment for a crime for which a person has been convicted, and thus the State has the lawful authority to impose involuntary servitude on Lymon as punishment for crimes for which he was convicted.  <u>See</u> Motion at 25.  The State Defendants also contend that the Court should dismiss Count XIV, because Lymon makes no allegations that Sanchez' classification decisions impact the general public, and thus no federal policy against public health hazards could have been violated.  <u>See</u> Motion at 26.  They further argue that Lymon lacks standing because he did not suffer an injury-in-fact.  <u>See</u> Motion at 26.

In response, Lymon states that he "alleges coercion in making him do heavy lifting in the face of a doctor's note that heavy lifting would be harmful to him."  Plaintiff's Response Memorandum to the State Defendants' Motion for Dismissal at 3, filed March 22, 2010 (Doc. 80). Lymon argues that, whereas the State Defendants describe the case as involving a simple shoulder injury, he contends it is a case about civil-rights violations.  <u>See</u> Response at 3.  Lymon argues that § 41-4-6 of the NMTCA is the applicable waiver for Lymon's claims in Counts I and II because

New Mexico courts have expanded the scope of § 41-4-6 beyond premise liability and his claims are within the expanded scope.  See Response at 6.  Lymon also contends that Sanchez engaged in deliberate, forcible conduct sufficient to invoke the waiver in § 41-4-6.  See Response at 7.  Lymon further argues that Sanchez was not acting as a "classification" officer, because the medical doctor had already performed the task for him, but rather was acting as a "regular" corrections officer carrying out the directives of the doctor.  Response at 8.  Lymon contends that, under New Mexico law, sheriffs, deputies, and jailers at the county jail are all law-enforcement officers within § 41-4-12.  See Response at 9.  Lymon further argues in his response brief that the State Defendants are liable for assault and battery of Lymon, because he was forced to do heavy lifting against his will and the State Defendants knew such lifting could cause him injury, and because immunity is waived under § 41-4-12.  See Response at 9.

In response to the State Defendants' argument that the Court should dismiss the due-process claims, Lymon argues that the primary focus of his Second Amended Complaint is substantive due-process violations based on the danger-creation doctrine.  See Response at 10.  Lymon contends that Aramark had a contractual relationship with the NMDOC which led to his injuries. See Response at 10.  He also argues that he had a contract with Aramark because he did work that Aramark accepted and for which it provided remuneration.  See Response at 11.  As to the State Defendants' argument that Lymon lacks standing to bring Counts VII, VIII, and XIV, Lymon argues that he filed an affidavit which states that he has Hepatitis C, which is one of the illnesses he mentions as a possible disease sustained from the kitchen at the prison, and thus he has asserted an injury-in-fact to establish standing.  See Response at 11.  Lymon argues, as to his Thirteenth Amendment claim, that "Defendants cite to no authority that assault and battery may be inflicted upon a prison inmate to force him to perform heavy lifting which has been upon medical (doctor's)

advice." Response at 11.  He also argues that the State Defendants interpretation of the Thirteenth Amendment "is without merit or authority" and therefore the Court should not dismiss Count XIII. Response at 12.

The State Defendants reply that Lymon does not dispute that the holding in <u>Archibeque v. Moya</u>, 116 N.M. 616, 866 P.2d 344 (1993) -- that § 41-4-6 does not waive immunity when public employees negligently perform administrative functions -- controls.  <u>See</u> State Defendants' Reply in Support of Rule 12(b) Motion to Dismiss at 1, filed March 26, 2010 (Doc. 85).  The State Defendants argue that this case is almost identical to the facts in <u>Archibeque v. Moya</u>, because, in both cases, the classification officer allegedly misclassified an inmate after being provided notice that there might be physical danger for the inmate if misclassified.  <u>See</u> Reply at 1.  The State Defendants further argue that Lymon did not allege in his Second Amended Complaint that other inmates were injured because of Sanchez' misclassifications, although he alleges that others were misclassified.  <u>See</u> Reply at 2.  The State Defendants argue that, to fall within § 41-4-6's waiver, the negligence of a public employee must cause bodily injury to more than one inmate, and Lymon has not made such allegations here.  <u>See</u> Reply at 2.  The State Defendants further contend that Sanchez and Hernandez should not be considered law-enforcement officers because there is no allegation that a majority of their time is spent enforcing the law.  <u>See</u> Reply at 5-6.  They argue that, even if they are considered law-enforcement officers, under § 41-4-12, their conduct does not fall within the acts listed in § 41-4-12.  <u>See</u> Reply at 6.  The State Defendants contend that Lymon, in his response, attempts to shoehorn in a cause of action -- assault and battery -- which appears nowhere in his Second Amended Complaint.  <u>See</u> Reply at 7.

As to Counts III and IV, the State Defendants argue that Lymon does not refute that, if no waiver exceptions are met, vicarious liability may not be imposed under the NMTCA.  Lymon also

does not dispute that none of his alleged negligence claims in Counts III and IV fall within § 41-4-6's waiver of immunity.  <u>See</u> Reply at 8.  The State Defendants also contend that Lymon does not argue in his due process claims in Counts V, VII, and VIII that he had any liberty or life interest which the State Defendants' actions impacted.  <u>See</u> Reply at 8.  Lymon argues, instead, that he is asserting a substantive due-process claim under the danger-creation doctrine.  The State Defendants counter that, if Lymon is asserting a substantive due-process claim, he must prove that the challenged government action "shocks the conscience" of federal judges, and that Lymon's allegations have not reached that high standard.  <u>Reply</u> at 9.  The State Defendants further argue that Lymon does not refute that Counts VII and VIII appear to be generalized grievances that legislation would better address.  <u>See</u> Reply at 11.  With respect to Lymon's argument that he had a contract with Aramark, the State Defendants argue that there can be no contract without consideration or freely obtained mutual assent, and contend that, as a prisoner, Lymon could be forced to work and thus consideration was not present.  <u>See</u> Reply at 11.  The State Defendants further contend that Sanchez ordering Lymon to work did not interfere with a contract to do work, and if Sanchez interfered with anything, it was with a medical order from a doctor, and not with a contract with Aramark.  <u>See</u> Reply at 11.

The State Defendants further argue that Lymon did not rebut the assertion that incarcerated persons are excepted from the Thirteenth Amendment's prohibition of forced labor.  <u>See</u> Reply at 12.  They contend that, even if Lymon was intimidated into doing heavy lifting, as he alleges, he still has no claim under the Thirteenth Amendment.  <u>See</u> Reply at 12.  The State Defendants also argue that Lymon made no attempt to rebut the argument that the individual State Defendants are entitled to qualified immunity.  <u>See</u> Reply at 12.

-10-

b.      The NMTCA Claims.

The State Defendants argue that the Court should dismiss Count I because the tort claims against Sanchez fall outside of the scope of the New Mexico Tort Claims Act's waivers of immunity for state employees.  See Motion at 4.  The State Defendants argue that Lymon's claims arise from Sanchez' alleged negligent misclassification of Lymon and that neither NMSA 1978, § 41-4-6 or § 41-4-12 -- both of which Lymon cites in Count I -- are applicable.  Section 41-4-6 waives immunity for conduct involving "the operation or maintenance of any building, public park, machinery, equipment or furnishings," and the State Defendants contend that a classification that allows an inmate to work in a certain section of the prison has nothing to do with the maintenance and operation of the prison's physical premises, and is thus not within the scope of the waiver. See Motion at 5.  The State Defendants also contend that the Supreme Court of New Mexico has directly addressed whether classification of inmates is included in the § 41-4-6 waiver, and has found that it does not.  See Motion at 5-6 (citing Archibeque v. Moya, 116 N.M. 616, 619, 866 P.2d 344, 347 (1993)).  The State Defendants further contend that § 41-4-12 is inapplicable because Sanchez is a classification officer within the NMDOC engaged in administrative tasks like classifying inmates for work and is not a law-enforcement officer.  See Motion at 6-7.  Further, the State Defendants contend that, even if the Court concludes that Sanchez is a law-enforcement officer, § 41-4-12 waives immunity only if the damages claimed arise from specific conduct listed in § 41-4-12 and argue that Sanchez' misclassification does not fall within the list of conduct. See Motion at 7-8.  The State Defendants argue that, because Sanchez' immunity from suit is not waived, the Court should dismiss Count I.

The State Defendants make a similar argument for why the Court should dismiss Count II. They argue that Lymon's claims against Hernandez also fall outside of the scope of immunity

waivers under the NMTCA.  In the Second Amended Complaint, Lymon alleges that Hernandez was negligent because he refused to grant Lymon permission to use the prison grievance process.  The State Defendants contend that Lymon's claim is beyond § 41-4-6's scope, because Hernandez' action was an administrative function that the waiver of immunity in § 41-4-6 does not cover. See Motion at 9.  The State Defendants further argue that Hernandez is not a law-enforcement officer for purposes of the waiver of immunity in § 41-4-12, and, even if he is considered a law-enforcement officer, Hernandez' conduct does not fall within the list of conduct in § 41-4-12. Thus, because no waiver of immunity is applicable to Lymon's negligence claims against Hernandez, the State Defendants argue that the Court should dismiss Count II as a matter of law. See Motion at 10.

The State Defendants further argue that the Court should dismiss the *respondeat superior* claims in Counts III and IV against Williams and NMDOC because the Court should dismiss Counts I and II and liability cannot be imposed if there is no underlying liability.  See Motion at 10-11.  The State Defendants further argue that the claims of negligence in Counts III and IV must also fail, as the claims do not fall within the scope of any of the NMTCA's immunity waivers of the NMTCA, nor do they fall within the scope of the Corrections Industries Act, NMSA 1978, § 33-8-3. See Motion at 17-18.

**3.     Arguments at the Hearing.**

At the hearing, Mr. Brown, Lymon's attorney, conceded that Sanchez and Hernandez are public employees and that, to bring claims under the NMTCA against them, the Court must find an applicable waiver.  See Transcript of Hearing at 24:24-25:14 (taken May 19, 2010)("Tr.")

(Court, Brown).[5]  Javier Junco, attorney for the State Defendants, argued that Lymon's asserted waivers -- § 41-4-6 and § 41-4-12 -- are inapplicable under the Supreme Court of New Mexico's holding in <u>Archibeque v. Moya</u> and the waiver provisions' clear language.  He argued that, under § 41-4-6, the negligence of a public employee must cause the bodily injury alleged, and, contrary to the argument Lymon makes in his response, the Second Amended Complaint does not allege that Sanchez' negligent misclassification caused bodily injury to more than one person.  Lymon's argument that the holding in <u>Archibeque v. Moya</u> is not applicable therefore fails.  <u>See</u> Tr. at 6:14-19 (Junco).  Mr. Junco further argues that Lymon's attempt in his response to argue that Sanchez was not negligently misclassifying, but rather intentionally disobeying a doctor's order, still does not bring Lymon's claim within the scope of the sovereign-immunity waivers in § 41-4-6 or § 41-4-12.  <u>See</u> Tr. at 9:9-21 (Junco).  Whether framed as misclassification or disobedience, Mr. Junco argued that Sanchez' task was still administrative and outside § 41-4-6's scope.  Further, he argued that the allegations in the Second Amended Complaint against Sanchez and Hernandez do not support a conclusion that they are law-enforcement officers for purposes of § 41-4-12's waiver of immunity, but, even if they were, the conduct alleged does not fall within the list of wrongs in § 41-4-12.  <u>See</u> Tr. at 10:18-11:5 (Junco).  Mr. Brown responded that <u>Archibeque v. Moya</u> is not controlling, because its procedural posture was on a certified question from the United States Court of Appeals for the Tenth Circuit and was not addressing a rule 12(b)(6) motion to dismiss, in which facts asserted in the complaint must be taken as true.  <u>See</u> Tr. at 12:17-13:4 (Brown).  He also argued that the assault in this case was threats made by Benavidez to Lymon that he had to work in the kitchen, in contravention of his medical restrictions against heavy lifting.  <u>See</u> <u>id.</u> at 13:20-25 (Brown).

---

[5] The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

-13-

He further argued that this case involved premise liability because Lymon slipped and fell. See id. at 14:5-16 (Brown). Mr. Junco replied that the difference in procedural posture between Archibeque v. Moya and this case is not relevant to the Supreme Court of New Mexico's discussion of § 41-4-6's scope. See Tr. at 15:24-15:10 (Junco). Mr. Junco also argued that Mr. Brown contends Benavidez, who is an employee of Aramark, committed the assault and battery, and the State Defendants cannot be held responsible for that conduct. See id. at 17:9-14 (Junco).

Mr. Junco further argued that Lymon lacks standing to bring Counts III, IV, VII, VIII, and XIV. See Tr. at 33:20-24 (Junco). He argued that broad allegations about general grievances are not appropriate, and that all of those Counts allege general grievances. See id. at 34:1-10 (Junco). Mr. Brown responded that further factual development is needed to determine what is wrong with the building and thus determining at this point whether Lymon has standing is premature. See id. at 34:24-35:15 (Brown). Mr. Junco replied that the hearing was the first time the State Defendants had heard anything about something being wrong with the building and argued that Mr. Brown is attempting to bring a new claim that the Second Amended Complaint did not allege. See Tr. at 35:20-36:3 (Junco).[6]

With regards to the due-process claims in Counts V, VII, and VIII, Mr. Junco argued that it was difficult for the State Defendants to determine from the Second Amended Complaint whether Lymon is alleging procedural due-process or substantive due-process violations. See Tr. at 39:3-8

---

[6] In the proposed second amended complaint included as part of Lymon's motion for reconsideration to file a second amended complaint for class certification, Lymon asserted a claim for "violations of federal and state law in maintaining the food establishment for inmates by all defendants," and alleged that the "Defendants continued to operate the kitchen after the building was condemned because of Mold, Rats [sic] and other unsafe conditions in approximately 2007." Plaintiff Davon Lymon's Reconsideration Motion to File a Second Amended Complaint for Class Certification at 23. Lymon did not include this claim in the operative Second Amended Complaint filed on December 14, 2009.

(Junco).  Mr. Junco contended that, if the claims are for violations of procedural due process, the Court should dismiss them, because Lymon "is not entitled to any liberty interests, because such interest arises upon release from confinement," and further, there are no allegations in the Second Amended Complaint that a liberty or life interest was impacted in any way.  Tr. at 39:8-17 (Junco). Mr. Junco argued that if, on the other hand, the claims are for substantive due-process violations, the allegations in Counts V, VII, and VIII do not rise to the level of shocking the conscience, as the Tenth Circuit requires.  See Tr. at 40:6-41:11 (Junco).  An inmate reinjuring his shoulder because of misclassification or denial of a grievance procedure, Mr. Junco argued, is not enough to meet the standard.  See id. at 41:25-42:7 (Junco).   Mr. Brown argued that it appears to him that Mr. Junco is bouncing back and forth between the original complaint and the Second Amended Complaint, and contended that "anybody who think that this case is just about an injury to his shoulder is lost and lost without remission."  Tr. at 45:10-46:3 (Brown).  Mr. Brown also represented to the Court that Lymon is asserting both procedural and substantive due-process violations, and argued that being a prisoner does not destroy the liberty interest.  See Tr. at 48:9-21 (Court, Brown).

Mr. Brown argued that Count VI should remain because oral contracts are permitted under New Mexico law.  See Tr. at 57:4-19 (Brown).  Mr. Junco argued that, even if there was an oral contract, there is no allegation that, within that alleged contract, prohibiting Lymon from lifting, and thus Sanchez could not have interfered with any contract, oral or otherwise.  See id. at 59:17-60:5 (Junco).  Mr. Brown argued that the Court should not dismiss Count XIII because an incarcerated individual cannot be subjected to involuntary servitude that forces him to do an action which causes him injury.  See id. at 62:5-9 (Brown).  Mr. Junco contended that the Thirteenth Amendment does not provide a remedy for one who injures himself during lawfully-compelled labor; it provides only prohibition from forced labor, and that Mr. Brown provided no authority that the Thirteenth

Amendment has been extended to apply to his allegations.  See id. at 63:14-22 (Junco).

Mr. Junco also argued the Court should dismiss Count XIV, which alleges that there is a federal policy against any decision which places the public at risk from a health hazard, because Lymon's Second Amended Complaint does not allege that Sanchez' misclassification of inmates impacted any member of the general public.  See Tr. at 65:8-66:9 (Junco).  Moreover, Mr. Junco asserted that Lymon lacks standing because he is not alleging personal injury as a result of the alleged conduct.  See id. at 65:8-66:9 (Junco).  Mr. Brown argued that Lymon has standing because he has Hepatitis C and he alleges that the disease came from working in the kitchen.  See id. at 66:17-25 (Brown).  Mr. Junco argued that such an allegation is not in the Second Amended Complaint and thus the Court should not consider the assertion in ruling on a 12(b)(6) motion. See id. at 67:4-15 (Junco, Court).

## STANDARD FOR A MOTION TO DISMISS UNDER RULE 12(b)(6)

Rule 12(b)(6) allows a court to dismiss a complaint for failure to state a claim upon which it can grant relief.  When ruling on a motion to dismiss, the court must accept as true well-pled factual allegations, but also consider whether "they plausibly give rise to an entitlement to relief." Barrett v. Orman, No. 10-7000, 2010 U.S. App. LEXIS 7807, at *5 (10th Cir. Apr. 15, 2010) (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009)).  Under rule 12(b)(6), a motion to dismiss "admits all well-pleaded facts in the complaint as distinguished from conclusory allegations." Mitchell v. King, 537 F.2d 385, 386 (10th Cir. 1976)(citing Jones v. Hopper, 410 F.2d 1323 (10th Cir. 1969)).  A motion to dismiss is a request to dismiss a case before discovery has taken place and thus permits only an assessment whether a complaint is sufficient on its face.  In adjudicating a motion to dismiss, a court may neither grant the motion because it believes it is unlikely the plaintiff can prove the allegations, see Robbins v. Oklahoma, 519 F.3d 1242, 1246

(10th Cir. 2008), nor "weigh potential evidence that the parties might present at trial" in assessing the motion's merit, Duran v. Carris, 238 F.3d 1268, 1270 (10th Cir. 2000)(quoting Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999)).  It is not the court's role to weigh potential evidence that the parties might present a trial, but rather to determine whether the plaintiff's complaint states a legally sufficient claim upon which the court can grant relief. See Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d at 1236.

A complaint challenged by a rule 12(b)(6) motion to dismiss does not require detailed factual allegations, but a plaintiff's obligation to set forth the grounds of his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  A complaint does not "suffice if it tenders naked assertions devoid of further factual enhancement." Ashcroft v. Iqbal, 129 S. Ct. at 1949 (internal alterations, citations, and quotations omitted).  See Bixler v. Foster, 596 F.3d 751, 756 (10th Cir. 2010)("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.")(quoting Ashcroft v. Iqbal, 129 S. Ct. at 1949). Dismissal is not appropriate, however, where the complaint contains "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. at 570.

"[T]he Supreme Court recently . . . prescribed a new inquiry for us to use in reviewing a dismissal: whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56 (internal citation omitted).  "The [Supreme] Court explained that a plaintiff must 'nudge his claims

-17-

across the line from conceivable to plausible' in order to survive a motion to dismiss." Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d at 1177 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 547) (alterations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 129 S. Ct. at 1949. "Thus, the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d at 1177 (emphasis in original). The court is not required to accept the conclusions of law or asserted application of law to the alleged facts. See Hackford v. Babbitt, 14 F.3d 1457, 1465 (10th Cir. 1994); Olpin v. Ideal Nat'l Ins. Co., 419 F.2d 1250, 1255 (10th Cir. 1969). Nor is the court required to accept as true legal conclusions that are presented as factual allegations. See Brooks v. Sauceda, 85 F. Supp. 2d 1115, 1123 (D. Kan. 2000)(citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). In Bell Atlantic Corp. v. Twombly, the Supreme Court noted that the complaint provided "no clue as to which of the four [regional phone companies] (much less their employees) supposedly agreed, or when and where the illicit agreement took place." 550 U.S. at 565 n.10. The Supreme Court explained that "a defendant seeking to respond to plaintiffs' conclusory allegations . . . would have little idea where to begin." Id.

A court must convert a motion to dismiss into a motion for summary judgment if "matters outside the pleading are presented to and not excluded by the court," and "all parties . . . [must be] given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(d). "[F]ederal courts have complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a

Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  5C C. Wright & A. Miller, Fed. Prac. & Proc. Civ., § 1366, at 159 (3d ed. 2004). See Dobson v. Anderson, 319 Fed. Appx. 698, 702 (10th Cir. 2008); Lowe v. Town of Fairland, 143 F.3d 1378,1381 (10th Cir. 1998)("[C]ourts have broad discretion in determining whether or not to accept materials beyond the pleadings.").

## LAW REGARDING 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Section 1983 creates only the right of action; it does not create any substantive rights.  Substantive rights must come from the Constitution or federal statute.  See Spielman v. Hildebrand, 873 F.2d 1377, 1386 (10th Cir. 1989)("Section 1983 does not provide a remedy if federal law does not create enforceable rights.").  Rather, 42 U.S.C. § 1983 authorizes an injured person to assert a claim for relief against a person who, acting under color of state law, violated the claimant's federally protected rights.  To state a claim upon which relief can be granted under § 1983, a plaintiff must allege:  (i) a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted under color of state law.  See West v. Aikins, 487 U.S. 42, 48 (1988).  Broken down differently, a plaintiff

must establish (1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a "person" (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Martinez v. Martinez, No. CIV 09-0281, 2010 WL 1608884, at *11 (D.N.M. Mar. 30, 2010)

-19-

(Browning, J.)(quoting Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).  Neither the civil-rights statutes nor the Fourteenth Amendment, however, are a license to the federal judiciary to displace state law through the creation of a body of general federal tort law.  See Paul v. Davis, 424 U.S. 693, 701 (1976)(Fourteenth Amendment); Griffin v. Breckenridge, 403 U.S. 88, 101-102 (1971)(civil-rights statute).

The Supreme Court has made clear that there is no *respondeat superior* liability under § 1983.  See Ashcroft v. Iqbal, 129 S. Ct. at 1948 ("Because vicarious liability is inapplicable to Bivens [v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971)] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of County Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor.  See Monell v. New York City Dept. of Soc. Servs., 436 U.S. at 689.  Further, the Tenth Circuit has held that supervisors are not liable under § 1983 "unless there is an affirmative link between the constitutional deprivation and the supervisor's exercise of control or direction, his personal participation, or his failure to supervise."  Kiesling v. Troughton, 107 F.3d 880 (Table), 1997 WL 111256, at *2 (10th Cir. Mar. 13, 1997)(citing Meade v. Grubbs, 841 F.2d 1512, 1527 (10th Cir. 1988)).  They can be held liable only for their own unconstitutional or illegal policies, and not for the tortious acts of their employees.  Supervisory liability requires a showing that said policies were a "deliberate or conscious choice."  Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998)(citations and internal quotations omitted).  See Bd. of County Comm'rs v. Brown, 502 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury

alleged.")(emphasis in original).

These standards apply for allegations of liability based on failure to train and for "official de facto policies" that arise from "failing to adopt various policies to adequately protect" a class of persons. Barney v. Pulsipher, 143 F.3d at 1367, 1309 n.8. "[W]hen the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm," it is liable. Id. at 1307.

> In a "narrow range of circumstances," however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

Id. at 1307-08. Most cases, however, will not fall within this "narrow range of circumstances" without "a pattern of violations." Id. at 1308.

## LAW REGARDING PROCEDURAL DUE-PROCESS CLAIMS

The Fourteenth Amendment protects citizens against state actions that deprive them of life, liberty, or property without due process of law. See U.S. Const. amend. XIV. "The right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause." Youngberg v. Romeo, 457 U.S. 307, 315 (1982)(citing Ingraham v. Wright, 430 U.S. 651, 673 (1977)). Persons in state custody have due-process rights to "reasonable care and safety." Youngberg v. Romeo, 457 U.S. at 324.

"To set forth an actionable procedural due process claim, a plaintiff must demonstrate: (1) the deprivation of a liberty or property interest and (2) that no due process of law was afforded." Stears v. Sheridan County Mem'l Hosp. Bd. of Trs., 491 F.3d 1160, 1162 (10th Cir. 2007).

See Zinermon v. Burch, 494 U.S. 113, 125 (1990)("In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law.").  "A due process claim . . . can only be maintained where there exists a constitutionally cognizable liberty or property interest with which the state has interfered." Steffey v. Orman, 461 F.3d 1218, 1221 (10th Cir. 2006).  The Tenth Circuit has recognized two sources of liberty interests: (i) the due process clause of the Fourteenth Amendment; and (ii) state law.  See Boutwell v. Keating, 399 F.3d 1203, 1211-12 (10th Cir. 2005).

### 1.      State-Created Liberty Interests.

A state may create a liberty interest.  The Supreme Court in Kentucky Department of Corrections v. Thompson, 490 U.S. 454 (1989), explained that "the most common manner in which a State creates a liberty interest is by establishing substantive predicates to govern official decision-making, and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met." 490 U.S. at 462 (internal quotation marks and citation omitted). Before the Supreme Court's decision in Sandin v. Conner, 515 U.S. 472 (1995), when faced with a due-process claim based on state statutes or prison regulations, courts were required to determine whether language existed creating "substantive predicates" to guide official discretion and whether the regulations contained "explicitly mandatory language."  Ky. Dep't of Corr. v. Thompson, 490 U.S. at 463 (requiring the language to contain "'explicitly mandatory language,' i.e., specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow, in order to create a liberty interest"); Hewitt v. Helms, 459 U.S. 460, 472 (1983)("We are persuaded that the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected

liberty interest."). In Sandin v. Conner, however, the Supreme Court abandoned that approach. The Supreme Court reasoned it "created disincentives for States to codify prison management procedures in the interest of uniform treatment" and "led to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone." 515 U.S. at 482. Consequently, the Supreme Court in Sandin v. Conner concluded that, while states may create liberty interests that the Due Process Clause protects,

> these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

515 U.S. at 484. See Cordova v. LeMaster, 136 N.M. 217, 222, 96 P.3d 778, 783-84 (2004)("After Sandin, in order to find Petitioner has a constitutionally protected liberty interest in spousal visitation, we must first determine whether regulations exist that limit official discretion in indefinitely depriving Petitioner of spousal visitation, and if so, whether the indefinite deprivation of spousal visitation is an atypical and significant hardship."). In Cordova v. LeMaster, the Supreme Court of New Mexico found that a prisoner has a liberty interest, which NMDOC regulations confers, to spousal visitation, "which if indefinitely deprived would impose upon him an atypical and significant hardship." 136 N.M. at 223, 96 P.3d at 784. The Supreme Court of New Mexico looked to the NMDOC's policies and found that regulations existed which limit prison officials' discretion to bar visitation. See 136 N.M. at 223, 96 P.3d at 784.

Under Sandin v. Conner, inmates have no liberty interest based on regulations regarding disciplinary measures unless those measures "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. 484. In Alvarez v. McCormac, 15 Fed. Appx. 759 (10th Cir. 2001), the Tenth Circuit affirmed the district court's dismissal of a

prisoner's § 1983 procedural due-process claim because the prisoner "did not have a constitutionally-protected liberty interest under state law that would prevent his twenty-day segregation, since such a sanction did not impose an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" 15 Fed. Appx. at 760 (quoting Sandin v. Conner, 515 U.S. at 484).

### 2.    Prisoner Procedural Due-Process Claims.

Prisoners do not shed all constitutional rights at the prison gate, see Wolff v. McDonnell, 418 U.S. 539, 555 (1974), but "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system," Jones v. N.C. Prisoners' Labor Union, Inc., 433 U.S. 119, 125 (1977) (quoting Price v. Johnston, 334 U.S. 266, 285 (1948)). In Daniels v. Williams, 474 U.S. 327(1986), the Supreme Court held that an injury arising from a prison officer's negligent actions does not deprive an individual of life, liberty, or property under the Fourteenth Amendment's due-process clause. The Supreme Court explained:

> We think that the actions of prison custodians in leaving a pillow on the prison stairs, or mislaying an inmate's property, are quite remote from the concerns [about governmental power being used for purposes of oppression] just discussed. Far from an abuse of power, lack of due care suggests no more than a failure to measure up to the conduct of a reasonable person. To hold that injury caused by such conduct is a deprivation within the meaning of the Fourteenth Amendment would trivialize the centuries-old principle of due process of law.

474 U.S. at 332. The Supreme Court found that "mere lack of due care by a state official [will not] 'deprive' an individual of life, liberty or property under the Fourteenth Amendment." 474 U.S. at 330-31. See County of Sacramento v. Lewis, 523 U.S. 833, 848 (1998)("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."). See also Davidson v. Cannon, 474 U.S. 344, 348 (1986)(clarifying that Daniels v. Williams applies to

-24-

substantive, as well as procedural, due process).

> Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society. We have previously rejected reasoning that "'would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States[.]'" Paul v. Davis, 424 U.S. 693, 701 (1976), quoted in Parratt v. Taylor, 451 U.S. [527], 544 [(1981)].

Daniels v. Williams, 474 U.S. at 332.

"Changing a prisoner's classification generally does not deprive him of liberty under the due process clause alone." Sparks v. Foster, 241 Fed. Appx. 467, 471 (10th Cir. 2007) (citing Hewitt v. Helms, 459 U.S. 460, 468 (1972)). "A liberty interest may be implicated, however, when State laws and prison regulations create a liberty interest to which due process protections apply." Sparks v. Foster, 241 Fed. Appx. at 471 (citing Meachum v. Fano, 427 U.S. 215, 226 (1976)). In Sparks v. Foster, Sparks, a Colorado state prisoner, brought a § 1983 action against corrections officers and the correctional facility, asserting that the defendants violated his Fourteenth Amendment right to procedural due process because a corrections officer allegedly forced him to cross a prisoner strike to work in the kitchen, despite inmate threats to any prisoner who crossed the line. See 241 Fed. Appx. at 468. The Tenth Circuit noted that, in Colorado, "[c]lassification decisions are within the discretion of the Department of Corrections and a particular classification does not implicate any liberty interest protected by the Fourteenth Amendment Due Process Clause." Sparks v. Foster, 241 Fed. Appx. at 471 (quoting Green v. Nadeau, 70 P.3d 574, 577 (Colo. App. 2003)(citing Deason v. Kautzky, 786 P.2d 420, 422 (Colo. 1990) (en banc)). The Tenth Circuit therefore found that, because Sparks did not have a liberty interest in a particular classification, he could not maintain an action based on the classification under the Fourteenth Amendment, and thus the district court properly dismissed Sparks' claim. See Sparks v. Foster,

241 Fed. Appx. at 471.

## LAW REGARDING SUBSTANTIVE DUE-PROCESS CLAIMS

The Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.  "[T]he Due Process Clause was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression."  County of Sacramento v. Lewis, 523 U.S. 833, 840 (1998) (internal quotations omitted).  The Supreme Court has stated that "the substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'"  523 U.S. at 846 (quoting Collins v. City of Harker Heights, 503 U.S. 115, 128 (1992)).  The Supreme Court has made it clear that the guarantee of due process is not a "font of tort law" to be used to impose liability any time a government actor causes harm.  County of Sacramento v. Lewis, 523 U.S. at 848 (internal quotations omitted).  "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."  523 U.S. at 848 (citing Daniels v. Williams, 474 U.S. at 331).  To establish a substantive due process claim, the "plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1223 (10th Cir. 2006)(quoting Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir. 1995)).

In general, state actors may be held liable under § 1983 only for their own acts and not for third parties' acts.  See DeShaney v. Winnebago County of Dep't of Soc. Servs., 489 U.S. 189, 197 (1989).  "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors."  DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. at 195.  The Due Process Clause is not a guarantee of a

minimal level of safety and security.  See DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. at 195.  Generally, negligence does not trigger the Due Process Clause's protections. See Davidson v. Cannon, 474 U.S. 344, 348 (1986).

1.      **Danger-Creation Exception.**[7]

The danger-creation theory provides that a state may be liable for an individual's safety if it created the danger that harmed the individual.  See Christianson v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003).  The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct."  Uhlrig v. Harder, 64 F.3d at 573.  The danger-creation exception to this rule applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  Under a danger-creation theory, there will be no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm." Uhlrig v. Harder, 64 F.3d at 573.  To state a prima-facie case, the plaintiff must show that his or her danger-creation claim for due-process violations meets a six-part test: (i) the state and individual actors must have created the danger or increased the plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate

_____

[7] There are two exceptions to the general rule that a state's failure to protect an individual against private violence does not constitute a violation of the due process clause: (i) the special-relationship doctrine, which arises when the state has a custodial relationship with the victim triggering an affirmative duty to provide protection; and (ii) the danger-creation theory, which provides that a state may also be liable for an individual's safety if it created the danger that harmed the individual.  See Schaefer v. Las Cruces Public School District, No. CIV 09-1119, 2010 U.S. Dist. LEXIS 52303, at *19 (D.N.M. Apr. 30, 2010)(Browning, J.).  Lymon alleges that only the danger-creation theory applies to his substantive due-process claims, and thus the Court only addresses the danger-creation exception and not the special-relationship doctrine.

harm; (iv) the risk must be obvious and known; (v) the defendant must have acted recklessly in conscious disregard of that risk; and (vi) such conduct, when viewed in total, must shock the conscience.  See Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d at 1126.

The Tenth Circuit has focused on the deliberateness of the conduct at issue. See Christiansen v. City of Tulsa, 332 F.3d at 1281.  The defendant must recognize the unreasonableness of the risk and intend to expose the plaintiff to such risks without regard to the consequences to the plaintiff.  See id. at 573 n.8.  While "an intent to harm" follows the traditional tort-law concept of intentionality, the Tenth Circuit has defined "an intent to place a person unreasonably at risk," as when a state actor "was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences." Medina v. City & County of Denver, 960 F.2d 1493, 1496 (10th Cir. 1992).

### 2.    What Shocks the Conscience.

"It is well settled that negligence is not sufficient to shock the conscience. In addition, a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." Camuglia v. The City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)).  "[T]he plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Uhlrig v. Harder, 64 F.3d at 574. "This is a 'high level of outrageousness.'" Camuglia v. the City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law;

and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. the City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three inmates. See 265 F.3d at 1132. The district court found that the plaintiff failed to state a § 1983 claim for violation of the Due Process Clause under a danger-creation theory because the defendants' actions were "not of such a magnitude that the Court is able to conclude they shock the conscience[.]" 265 F.3d at 1134. The Tenth Circuit agreed with the conclusion of the district court, stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or risks [was] not enough to satisfy the danger-creation theory's conscience shocking standard." 265 F.3d at 1135.

In Schaefer v. Las Cruces Public School District, No. CIV 09-1119, 2010 U.S. Dist. LEXIS 52303 (D.N.M. Apr. 30, 2010)(Browning, J.), the plaintiffs alleged that the defendants -- the school district, superintendent, principal, and vice principal of a middle school -- violated the plaintiffs' substantive due process rights when they did not take sufficient action to prevent a student at the school from "racking"[8] the plaintiffs' son. See 2010 U.S. Dist. LEXIS 52303, at *43-44. The Court concluded that the defendants' conduct did not shock the conscience. See id., at *49. The Court explained:

---

[8] The parties in Schaefer v. Las Cruces Public School District defined being "racked" as being "kicked and/or punched in the testicles."

Assuming the absolute worst from the Schaefers' alleged facts, the Defendants were aware of three instances of an unknown eighth-grade student racking various sixth-grade students within the span of a month, and failed to implement policies to improve hallway monitoring and stop this conduct from occurring in time to prevent [the plaintiffs' son] from falling victim to the same fate.  Further, the Defendants indicated to the sixth graders that it had policies in place to punish individuals that assaulted other students but did not, in fact, have such policies.

While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked. . . .

Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy.  Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

2010 U.S. Dist. LEXIS 52303, at **49-52.

## LAW REGARDING 42 U.S.C. § 1981

42 U.S.C. § 1981 prohibits racial discrimination in the making and enforcement of private contracts:

**§ 1981.  Equal rights under the law**

**(a) Statement of equal rights.** All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**(b) "Make and enforce contracts" defined.** For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

**(c) Protection against impairment.** The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.  To establish a prima-facie case of discrimination under § 1981, a plaintiff must

show: (i) that she is a member of a protected class; (ii) that the defendant intended to discriminate

on the basis of race; and (iii) that the discrimination interfered with a protected activity as defined

in § 1981.  See Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091, 1101-02 (10th Cir. 2001).

Tenth Circuit § 1981 jurisprudence "requires that the action interfered with must be based on a

contract."  Hampton v. Dillard Dep't Stores, Inc., 247 F.3d at 1101.  See Phelps v. Wichita

Eagle-Beacon, 886 F.2d 1262, 1267 (10th Cir. 1989)(requiring actual loss of a contract interest for

a § 1981 claim for interference with the right to make and enforce a contract).  Claims under § 1981

for interference with the right to make or enforce a contract must involve actual loss of a contract

interest, not merely the possible loss of future contract opportunities.  See Harris v. Allstate Ins. Co.

300 F.3d 1183, 1195 (10th Cir. 2002).

        To state a claim under 42 U.S.C. § 1981, a claimant must show that a defendant intentionally

or purposefully discriminated against him or her.  See Lindsey v. Thomson, 275 Fed. Appx. 744,

745 (10th Cir. 2007)(finding that the plaintiff's complaint failed to state an actionable claims under

42 U.S.C. § 1981 "because there is no allegation that the Defendants intentionally discriminated

against the Plaintiff on the basis of race"); Reynolds v. Sch. Dist. No. 1, Denver, Colorado, 69 F.3d

1523, 1532 (10th Cir. 1995); Allen v. Washington Hosp., No. 96-1950, 1997 U.S. Dist. LEXIS

14606, at **5-6 (W.D. Pa. May 30, 1997)(denying motion to dismiss when plaintiff alleged that the

defendants refused to provide him with an application for appointment to a medical-staff position

solely because of race); Tucker v. Merck & Co., No. Civ. A. 03-5015, 2004 U.S. Dist. LEXIS 2658,

at *3 (E.D. Pa. Feb. 18, 2004)(holding that second prong was satisfied when "complaint explicitly

alleges that defendant intentionally discriminated against [plaintiff] on the basis of race").  "An

individual who establishes a cause of action under § 1981 is entitled to both equitable and legal

relief including compensatory and, under certain circumstances, punitive damages." Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 460 (1975)

"Typically, most litigation involving § 1981 claims has emanated from the right to make and enforce employment contracts."  Hampton v. Dillard Dep't Stores, Inc., 247 F.3d at 1102.  The statute has also been applied to discrimination claims arising in the retail sector and restaurant industry.  See Bobbitt v. Rage, Inc., 19 F. Supp. 2d 512, 518-20 (W.D.N.C. 1998)(allowing action to proceed where plaintiffs, who were forced to prepay for food in pizza restaurant, demonstrated that the restaurant altered a fundamental characteristic of the food service based on race); Washington v. Duty Free Shoppers, Ltd., 710 F. Supp. 1288, 1289-90 (N.D. Cal. 1988)(denying summary judgment to defendant where African-American customers were told they needed to show a passport and airline tickets before shopping for duty-paid goods, while other customers were not required to do so).

**LAW REGARDING THE THIRTEENTH AMENDMENT AND PRISON LABOR**

Although the Constitution includes, in the Thirteenth Amendment, a general prohibition against involuntary servitude, it expressly excepts from that general prohibition forced labor "as a punishment for crime whereof the party shall have been duly convicted."   U.S. Const. amend. XIII, § 1.  See Tracy v. Keating, 42 Fed. Appx. 113, 116 (10th Cir. 2002)(stating, "by its express language, the Thirteenth Amendment's prohibition of slavery does not apply to the imprisonment of a person lawfully convicted of a crime."); Bowen v. Quarterman, 339 Fed. Appx. 479, 481 (5th Cir. 2009)(rejecting the inmate's argument that prison officials forced him to perform labor in violation of the Thirteenth Amendment "because requiring an inmate to perform labor is not involuntary servitude under the Amendment."); O'Connell v. Johnson, 245 Fed. Appx. 193, 194 (3d Cir. 2007)("O'Connell was a duly convicted prisoner during the time

period at issue and his claim under the Thirteenth Amendment fails."); Piatt v. MacDougall, 773 F.2d 1032, 1035 (9th Cir. 1985)("The Thirteenth Amendment does not prohibit involuntary servitude as part of imprisonment for a crime.").   Some circuits have also held that a person sentenced to serve a term of imprisonment can be required to work during the time his or her appeal is pending before a reviewing court.  See Tourscher v. McCullough, 184 F.3d 236, 240 (3d Cir. 1999)("We agree with our sister circuits that a duly convicted prisoner continues in that status until his or her appeal becomes final even if it results in a reversal of the conviction."); Omasta v. Wainwright, 696 F.2d 1304, 1305 (11th Cir. 1983)(holding that, "where a prisoner is incarcerated pursuant to a presumptively valid judgment . . . the thirteenth amendment's prohibition against involuntary servitude is not implicated. . . . even though the conviction may be subsequently reversed."); Stiltner v. Rhay, 322 F.2d 314, 315 (9th Cir. 1963)("There is no federally protected right of a state prisoner not to work while imprisoned after conviction, even though that conviction is being appealed.").

Courts have also found that prisoners may work without compensation without violating the Thirteenth Amendment.  See Lineberry v. United States, No. 09-40262, 2010 U.S. App. LEXIS 11269, at *6 (5th Cir. 2010)(finding that denying an inmate good-time credit because he refuses to work does not support a claim that the inmate is subject to involuntary servitude in violation of the Thirteenth Amendment.); Serra v. Lappin, 600 F.3d 1191, 1196 (9th Cir. 2010)("The Constitution does not provide prisoners any substantive entitlement to compensation for their labor."); Piatt v. MacDougall, 773 F.2d at 1035 (holding that the state does not deprive a prisoner of a constitutionally protected liberty interest by forcing him to work without pay); Lockett v. Neubauer, No. 05-3209, 2005 U.S. Dist. LEXIS 36898, at *12 (D. Kan. Dec. 29, 2005)(stating that "the Thirteenth Amendment excludes convicted criminals from its prohibition of involuntary servitude,

so prisoners may be required to work without any compensation.").

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. at 807. Qualified immunity "protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.) (quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 129 S. Ct. 808, 815 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 129 S. Ct. at 815 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the plaintiff to meet a "heavy two-part burden." Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001). The plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged unlawful activity. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009); Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007). In assessing whether the right was clearly established, the court asks whether the right was sufficiently clear that a reasonable officer in the defendant's shoes would understand that what he or she did violated that right. See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d at 1327. In

-34-

Saucier v. Katz, 533 U.S. 194 (2001), overruled in part by Pearson v. Callahan, the Supreme Court held that the court must decide whether there was a constitutional violation first, before it decides whether the law is clearly established.  See 533 U.S. at 200-01.  The Supreme Court no longer requires the courts to analyze the issues in that order.  See Pearson v. Callahan, 129 S. Ct. at 818.

### 1.    **Factual Disputes in the Qualified-Immunity Analysis.**

In determining whether the plaintiff has met his or her burden of establishing a constitutional violation that was clearly established, the court construes the facts in the light most favorable to the plaintiff as the non-moving party.  See Scott v. Harris, 550 U.S. 372, 378-80 (2007); Riggins v. Goodman, 572 F.3d at 1107 (noting that the Tenth Circuit "accept[s] the facts as the plaintiff alleges them").   In Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), the Tenth Circuit explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott [v. Harris], 550 U.S. at 380); see also Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake County, 584 F.3d at 1312.  The Tenth Circuit, in Rhoads v. Miller, 352 Fed. Appx. 289 (10th Cir. 2009), recently explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony:

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380.   In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events.  550 U.S. at 379.  Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads'

-35-

testimony.  There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury.  And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . .  Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistence or provocation.  If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under <u>Graham v. Connor</u>, 490 U.S. 386, 395-96 (1989), and this court's precedent.

<u>Rhoads v. Miller</u>, 352 Fed. Appx. at 291-92 (internal citations and quotations omitted).  In a concurring opinion in <u>Thomson v. Salt Lake County</u>, Judge Holmes stated that the court must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court" before inquiring into whether there are genuine issues of material fact for resolution by the jury.  584 F.3d at 1326-27 (Holmes, J. concurring)(citing <u>Goddard v. Urrea</u>, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting)(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts.")).

## 2. <u>Clearly Established Rights.</u>

A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned." <u>Zweibon v. Mitchell</u>, 720 F.2d 162, 172-73 (D.C. Cir. 1983), <u>cert. denied</u>, 469 U.S. 880 (1984). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  <u>Strepka v. Miller</u>, 2001 WL 1475058, at * 5 (10th Cir. 2001)(citing <u>Currier v. Doran</u>, 242 F.3d 905, 923 (10th Cir. 2001)).  <u>See</u> <u>Medina v. City</u>

-36-

and County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. at 640.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified-immunity defense.  In Pearson v. Callahan, the Supreme Court held that, "while the sequence set forth [in Saucier v. Katz] is often appropriate, it should no longer be regarded as mandatory."  129 S. Ct. at 818.  Rather, lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  Id.  The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz will often be beneficial.  See Pearson v. Callahan, 129 S. Ct. at 819.  Once the plaintiff has established the inference that the defendant's conduct violated a clearly established constitutional right, a qualified-immunity defense generally fails.  See Cannon v. City and County of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

## LAW REGARDING THE NEW MEXICO TORT CLAIMS ACT

The New Mexico Legislature enacted the NMTCA because it recognized "the inherent unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity."  NMSA 1978, § 41-4-2A.  The New Mexico Legislature, however, also recognized

> that while a private party may readily be held liable for his torts within the chosen ambit of his activity, the area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done.

NMSA 1978, § 41-4-2A.  As a result, it was "declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act and in accordance with the principles established in that act."  NMSA 1978, § 41-4-2A. The NMTCA is also "based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty." NMSA 1978, § 41-4-2C.

> The NMTCA is the
>
> exclusive remedy against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act and no other claim, civil action or proceeding for damages, by reason of the same occurrence, may be brought against a governmental entity or against the public employee or his estate whose act or omission gave rise to the suit or claim.

NMSA 1978, § 41-4-17A.  A plaintiff may not sue a governmental entity of New Mexico or its employees or agents unless the plaintiff's cause of action fits within one of the exceptions granted for governmental entities and public employees in the NMTCA.  See Begay v. State, 104 N.M. 483, 486, 723 P.2d 252, 255 (Ct. App.1985)("Consent to be sued may not be implied, but must come within one of the exceptions to immunity under the Tort Claims Act."), rev'd on other grounds by Smialek v. Begay, 104 N.M. 375, 721 P.2d 1306 (1986).  A plaintiff also may not sue a governmental entity or its employees for a damage claim arising out of violations of rights under the New Mexico Constitution unless the NMTCA contains a waiver of immunity.  See Barreras v. N.M. Corr. Dep't, 133 N.M. 313, 319, 62 P.3d 770, 776 (Ct. App. 2003)("In the absence of affirmative legislation, the courts of this state have consistently declined to permit individuals to bring private lawsuits to enforce rights guaranteed by the New Mexico Constitution, based on the

absence of an express waiver of immunity under the Tort Claims Act."); Chavez v. City of Albuquerque, 124 N.M. 479, 482, 952 P.2d 474, 477 (Ct. App. 1998)(noting that a plaintiff cannot seek damages for violations of rights under the New Mexico Constitution against a city or its employees or agents unless the NMTCA waives immunity); Rubio v. Carlsbad Mun. Sch. Dist., 106 N.M. 446, 449, 744 P.2d 919, 922 (Ct. App. 1987)(holding that no waiver of immunity exists for damages arising out of alleged educational malpractice claim against a school board); Begay v. State, 104 N.M. at 488, 723 P.2d at 257 (finding that no waiver existed in NMTCA for suit under Article II, § 11 of the New Mexico Constitution).  Thus, if no specific waiver can be found in the NMTCA, a plaintiff's complaint against the governmental entity or its employees must be dismissed.  See Begay v. State, 104 N.M. at 486, 723 P.2d at 255.

1. **Section 41-4-6.**

Section 41-4-6 exempts from immunity "liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings."  NMSA 1978, § 41-4-6.  This exception balances the principle that "government should not have the duty to do everything that might be done" with the desire "to compensate those injured by the negligence of public employees and to impose duties of reasonable care." Cobos v. Doña Ana County Hous. Auth., 126 N.M. 418, 420, 970 P.2d 1143, 1145 (1998)(citations and internal quotations omitted).  To resolve the tension between these two goals, § 41-4-6 "grant[s] governmental entities and employees a general immunity from tort liability, [and] waives that immunity in certain defined circumstances."  Cobos v. Doña Ana County Hous. Auth., 126 N.M. at 420, 970 P.2d at 1145.  The Supreme Court of New Mexico has explained that, "[w]hile [§] 41-4-6 may appropriately be termed a 'premises liability' statute, the liability envisioned by that

section is not limited to claims caused by injuries occurring on or off certain 'premises,' as the words 'machinery' and 'equipment' reveal." Cobos v. Doña Ana County Hous. Auth., 126 N.M. at 421, 970 P.2d at 1146.  Section 41-4-6 "contemplates waiver of immunity where due to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective condition on property owned and operated by the government." Bober v. New Mexico State Fair, 111 N.M. 644, 653, 808 P.2d 614, 623 (1991)(citations and internal quotations omitted).  New Mexico courts have found that  § 41-4-6's waiver of immunity does not extend to negligent supervision, see Pemberton v. Cordova, 105 N.M. 476, 478, 734 P.2d 254, 256 (Ct. App. 1987), negligent design, see Rivera v. King, 108 N.M. 5, 12, 765 P.2d 1187, 1194 (Ct. App.), cert. denied, 107 N.M. 785, 765 P.2d 758 (1988), negligent inspection, see Martinez v. Kaune, 106 N.M. 489, 491-92, 745 P.2d 714, 716-17 (Ct. App.), cert. denied, 106 N.M. 439, 744 P.2d 912 (1987), or negligent classification of a prison inmate, see Archibeque v. Moya, 116 N.M. 616, 620, 866 P.2d 344, 348 (1993).

In the prison context, the Supreme Court of New Mexico has held that "[t]he 'operation' and 'maintenance' of the penitentiary premises, as these terms are used in [§] 41-4-6, does not include the security, custody, and classification of inmates. . . . Section 41-4-6 does not waive immunity when public employees negligently perform such administrative functions." Archibeque v. Moya, 116 N.M. at 619, 866 P.2d at 347 (citations omitted).  In Archibeque v. Moya, Chris Archibeque, an inmate at the Central New Mexico Correction Facility, was transferred to the New Mexico State Penitentiary in Santa Fe, New Mexico.  See 116 N.M. at 618, 866 P.2d at 346.  Before being released into general population, a prison intake officer, Moya-Martinez, met with Archibeque to discuss whether he had any known enemies within the prison's general population.  Archibeque informed Moya-Martinez that another inmate, Gallegos, was one of his enemies, and

-40-

Moya-Martinez, without checking an available list of current inmates, informed Archibeque that

Gallegos was no longer at the prison.  He was released into general population, and Gallegos

assaulted him that night.  See 116 N.M. at 618, 866 P.2d at 346.  Archibeque sued Moya-Martinez,

other corrections officers, and the NMDOC in federal court for violations under 42 U.S.C. § 1983

and the NMTCA.  The district court interpreted § 41-4-6 narrowly and held that the statute did not

waive immunity for negligent security and custody of inmates at the penitentiary. Thereafter,

Archibeque's § 1983 claims were resolved in favor of Moya-Martinez and the other corrections

employees.  The federal district court denied Archibeque's motion for reconsideration. Archibeque

appealed, and the Tenth Circuit certified a question to the Supreme Court of New Mexico:

> Does [NMSA 1978, Section 41-4-6] of the New Mexico Tort Claims Act, [NMSA
> 1978, Sections 41-4-1 to -29], provide immunity from tort liability to an employee
> of the state penitentiary whose alleged negligence in releasing a prisoner into the
> general prison population, which included known enemies of the prisoner, resulted
> in the prisoner being beaten and injured by one of his enemies?

See 116 N.M. at 617, 866 P.2d at 345.  Archibeque argued that Moya-Martinez was participating

in the operation of the penitentiary when she classified Archibeque as an inmate who could safely

be released into the general prison population, and he argued that Moya-Martinez's alleged

negligence in misclassifying him and releasing him into the general population constituted negligent

operation of the penitentiary, thereby waiving immunity under § 41-4-6.  See 116 N.M. at 618-19,

866 P.2d at 346-47.  The Supreme Court of New Mexico found that § 41-4-6 did not waive

Moya-Martinez' immunity, stating: "The 'operation' and 'maintenance' of the penitentiary

premises, as these terms are used in Section 41-4-6, does not include the security, custody, and

classification of inmates."  116 N.M. at 619, 866 P.2d at 347.  The Supreme Court of New Mexico

reasoned that Moya-Martinez was not operating and maintaining the prison's physical premises

when she negligently classified Archibeque.

Rather, she was performing an administrative function associated with the operation of the corrections system. Section 41-4-6 does not waive immunity when public employees negligently perform such administrative functions. To read Section 41-4-6 as waiving immunity for negligent performance of administrative functions would be contrary to the plain language and intended purpose of the statute. See State v. Riddall, 112 N.M. 78, 80, 811 P.2d 576, 578 (Ct. App.)(stating that when interpreting a statute, an appellate court is required to consider the plain meaning of the words used and the intended purpose of the statute), cert. denied, 112 N.M. 21, 810 P.2d 1241 (1991).

Archibeque v. Moya, 116 N.M. at 619, 866 P.2d at 347. The Supreme Court of New Mexico further explained:

While Moya-Martinez's misclassification of Archibeque put him at risk, the negligence did not create an unsafe condition on the prison premises as to the general prison population. Reading Section 41-4-6 to waive immunity every time a public employee's negligence creates a risk of harm for a single individual would subvert the purpose of the Tort Claims Act, which recognizes that government, acting for the public good, "should not have the duty to do everything that might be done," and limits government liability accordingly. See Section 41-4-2(A).

116 N.M. at 620, 866 P.2d at 348. According to the Supreme Court of New Mexico, to permit a waiver of immunity under § 41-4-6 whenever injury results from a negligently performed administrative task "would undermine the purpose of the Tort Claims Act by subjecting the State to liability for virtually any mistake made during the administration of corrections facilities that results in injury to an inmate." 116 N.M. at 621, 866 P.2d at 349. The Supreme Court of New Mexico noted that, "[w]hile a segment of the population at risk might justify waiver of immunity under Section 41-4-6, a situation in which a single inmate is put at risk is not comparable." 116 N.M. at 621 n.3, 866 P.2d at 349 n.3. The Honorable Richard Ransom, Chief Justice of the Supreme Court of New Mexico, in his concurring opinion, noted:

I concur because there was no showing that the general prison population reflected anything but the reasonable and expected risks of prison life. The classification of Archibeque did not change the condition of the premises. I see Archibeque's injuries as having been proximately caused by a discrete administrative decision. As an alternative to releasing Archibeque into the general population, he could have been

-42-

> placed in administrative segregation, a form of protective custody.  The risk arose not from a condition of the premises (as with the wild dogs in Castillo or, arguably, the inadequate health care facilities in Silva [v. State, 106 N.M. 472, 745 P.2d 380 (1987)]); it arose from the classification itself.

116 N.M. at 622, 866 P.2d at 350 (Ransom, C.J., concurring).

In Callaway v. New Mexico Department of Corrections, 117 N.M. 637, 642, 875 P.2d 393, 398 (Ct. App.), cert. denied, 118 N.M. 90, 879 P.2d 91 (1994), the New Mexico Court of Appeals held that the NMDOC "knew or should have known that roaming gang members with a known propensity for violence had access to potential weapons in the recreation area, that such gang members created a dangerous condition on the premises of the penitentiary, and that the danger to other inmates was foreseeable."  117 N.M. at 643, 875 P.2d at 399.  The New Mexico Court of Appeals found that the "inmate assailant was unusually dangerous and the prison authorities had knowledge of the danger posed by the inmate."  117 N.M. at 643, 875 P.2d at 399.

## 2.  **Section 41-4-12.**

Section 41-4-12 of the NMTCA provides a waiver of immunity for certain torts committed by law-enforcement officers and for negligence that causes a specified tort. See Oliveros v. Mitchell, 449 F.3d 1091, 1096 (10th Cir. 2006)(citing Methola v. County of Eddy, 95 N.M. 329, 622 P.2d 234, 238 (1980); Caillouette v. Hercules, Inc., 113 N.M. 492, 827 P.2d 1306, 1311 (Ct. App. 1992)).  Section 41-4-12 provides:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

NMSA 1978, § 41-4-12.

> [I]n order to state a tort claim under the waiver of immunity set out in Section 41-4-12, a plaintiff must demonstrate that the defendants were law enforcement officers acting within the scope of their duties, and that the plaintiff's injuries arose out of either a tort enumerated in this section or a deprivation of a right secured by law.

Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 121 N.M. 646, 649, 916 P.2d 1313, 1316 (1996).

A law-enforcement officer is a "full-time salaried public employee of a governmental entity whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes, or members of the national guard when called to active duty by the governor."  NMSA 1978, § 41-4-3.  "New Mexico courts have construed this definition strictly." Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-633, 2009 U.S. Dist. LEXIS 47154, at *10 (D.N.M. Apr. 20, 2009)(citing cases).  See, e.g., Montes v. Gallegos, 812 F. Supp 1165, 1172 (D.N.M. 1992)(holding that mayor is not a law-enforcement officer under the NMTCA, notwithstanding his statutory authority and obligation to exercise law enforcement functions); Dunn v. McFeeley, 127 N.M. 513, 984 P.2d 760, 767 (Ct. App.)(holding OMI Medical Investigator and crime laboratory technician are not law-enforcement officers under the NMTCA), cert. denied, 127 N.M. 389, 981 P.2d 1207 (1999); Coyazo v. State, 120 N.M. 47, 51, 897 P.2d 234, 238 (Ct. App 1995)(holding that the District Attorney and his staff are not law-enforcement officers under § 41-4-3D); Callaway v. N.M. Dep't of Corr., 117 N.M. at 641, 875 P.2d at 397 (holding that correctional officers at penitentiary are not law-enforcement officers under the NMTCA, notwithstanding their statutory power to make arrests); Dunn v. State ex rel. Tax. and Rev. Dep't, 116 N.M. 1, 4, 859 P.2d 469, 472 (Ct. App. 1993)(holding that Director of Motor Vehicle Division is not a law-enforcement officer under the NMTCA, notwithstanding his statutory power to make arrests); Vigil v. Martinez, 113 N.M. 714, 721, 832 P.2d 405, 412 (Ct. App. 1992)(holding that

probation and parole officers are not law-enforcement officers under the NMTCA); Anchondo v. Corr. Dep't, 100 N.M. 108, 111, 666 P.2d 1255, 1258 (1983)(holding that the Secretary of Corrections and the Warden of a state penitentiary are not law-enforcement officer under the NMTCA). See also Johnson v. Holmes, 377 F. Supp. 2d 1069, 1083 (D.N.M. 2004)(Browning, J.) ("'Akin' to a law enforcement officer is, as a matter of law, insufficient to waive sovereign immunity under § 41-4-12 NMSA 1978."), aff'd, 455 F.3d 1133 (10th Cir. 2006).

The New Mexico Court of Appeals has held that corrections officers who hold convicted persons in custody are not law-enforcement officers under § 41-4-3D, which defines law-enforcement officer as used in § 41-4-12. See Callaway v. N.M. Dep't of Corr., 117 N.M. at 641, 875 P.2d at 397 (stating "we affirm the trial court's determination that corrections officers are not law enforcement officers under Section 41-4-3(D)."). In Anchondo v. Corrections Department, the Supreme Court of New Mexico received a certified question from the Honorable Juan G. Burciaga, United States District Judge for the District of New Mexico, asking: "Are the Secretary of Corrections and the Warden of the State Penitentiary in Santa Fe 'law enforcement officers' within the meaning of Section 41-4-3(D), NMSA 1978?" 100 N.M. at 109, 666 P.2d at 1256. The Supreme Court of New Mexico found that the Secretary of Corrections and the Warden are not law-enforcement officers. See 100 N.M. at 109, 666 P.2d at 1256. The Supreme Court of New Mexico explained:

> From looking at the statutes, we see that neither the Secretary of Corrections nor the Warden engage in any of the traditional duties of "law enforcement officers." They do not deal directly with the daily custodial care of prison inmates. Moreover, because they do not have commissions, they have no power to make arrests or to take people into custody should a violation of the public order occur. They are merely administrative officers appointed by the governor to oversee, administer, and supervise the state's corrections system.

100 N.M. at 109-10, 666 P.2d at 1256-57. "To determine whether positions are of a law

enforcement nature, this Court will look at the character of the principal duties involved, those duties to which employees devote the majority of their time."  Anchondo v. Corr. Dep't, 100 N.M. at 110, 666 P.2d at 1257.  The Supreme Court of New Mexico has stated that "no case has held that simple negligence in the performance of a law enforcement officer's duty amounts to commission of one of the torts listed in [§ 41-4-12]."  Bober v. N.M. State Fair, 111 N.M. 644, 653-54, 808 P.2d 614, 623-24 (1991).

## NEW MEXICO CORRECTIONS INDUSTRIES ACT

The Legislature promulgated the Corrections Industries Act, NMSA 1978, §§ 33-8-1 through 33-8-15, "to enhance the rehabilitation, education and vocational skills of inmates through productive involvement in enterprises and public works of benefit to state agencies and local public bodies and to minimize inmate idleness."  NMSA 1978, § 33-8-3.  Section 33-8-4 of the Corrections Industries Act provides in pertinent part: "All persons convicted of crime and confined in a facility . . . shall perform labor under such rules and regulations as have been or may hereafter be prescribed by the department."  NMSA 1978, § 33-8-4 (2010).  The Corrections Industries Act defines "enterprise" as "a manufacturing, agricultural or service operation or group of closely related operations within the bounds of a facility but does not include standard facility maintenance activities and services."  NMSA 1978, § 33-8-2C.  A "facility" is defined as "a place under the jurisdiction of the department at which individuals are confined pursuant to court order."  NMSA 1978, § 33-8-2D.  "Public works" constitutes "work that is solely for a public or state purpose and includes but is not limited to the construction, maintenance and improvement of state and local lands, roads, highways and buildings."  NMSA 1978, § 33-8-15B.  Given the plain language of the Corrections Industries Act, which involves inmates working in enterprises and public works, it does not appear that it encompasses labor in the prison kitchen, which better fits

within the scope of "standard facility maintenance and services," an exception to "enterprise" as defined in the Act.  NMSA 1978, § 33-8-2C.

## ANALYSIS

The State Defendants move the Court to dismiss all claims in Lymon's Second Amended Complaint asserted against them.  Of the fifteen claims asserted, ten of them have been brought either against all Defendants, or against one or more of the State Defendants.  The Court has carefully considered the claims in the Second Amended Complaint, and taking all well-pleaded factual allegations as true, the Court finds that Lymon has failed to state federal constitutional claims against the State Defendants upon which the Court can grant relief in Counts V, VI, VII, VIII, XIII, and XIV; the Court therefore will dismiss those Counts as asserted against the State Defendants. The Court also finds that the State Defendants' immunity under the NMTCA is not waived, and the Court will therefore dismiss the state claims in Counts I, II, III, and IV asserted against the State Defendants.  The Court will thus dismiss the State Defendants from the case.

I.    **THE COURT WILL DISMISS COUNT V BECAUSE LYMON'S ALLEGATIONS SUPPORT NEITHER A PROCEDURAL NOR A SUBSTANTIVE DUE-PROCESS CLAIM FOR WHICH THE COURT CAN GRANT RELIEF.**

In Count V, Lymon alleges that he has a liberty interest in protection from Sanchez and Hernandez forcing him to work for Aramark.  He also alleges:

> Officer Sanchez' deliberate over-ruling of the physician's order to limit heavy lifting by assigning Plaintiff to a work place where he would be required to do heavy lifting was sadistic and mean spirited.  This conduct by [O]fficer Sanchez SHOCKS THE CONSCIENCE OF THE COURT because Plaintiff was incarcerated and had no redress for his grievances because [O]fficer Abner Hernandez denied Plaintiff any avenue of grievance or appeal.

Second Am. Complaint ¶ 40, at 10.  Lymon further alleges that Sanchez' actions affected "basic life needs of medical care and food[.]"  Second Am. Complaint ¶ 40, at 10.  The State Defendants, in

their motion to dismiss, argue that Lymon does not assert a protected liberty interest, nor does he allege that such interest, if it exists, was impaired.  See Motion at 19-20.  In response, Lymon argues that the case law the State Defendants cited in their motion addresses procedural due process, "while the primary focus of Plaintiff's complaint is Substantive Due Process."  Response at 10.  At the hearing, however, Mr. Brown stated that Lymon is asserting both procedural and substantive due process claims.  See Tr. at 48:9-21 (Court, Brown).

### A.   LYMON HAS NOT DEMONSTRATED A DEPRIVATION OF A LIBERTY INTEREST.

In Count V, Lymon alleges that he "had a liberty interest in protection from abuse of inmate labor by the actions of NMDOC employees John Sanchez and Abner Hernandez."  Second Am. Complaint ¶ 37, at 9.  To set forth an actionable procedural due-process claim, Lymon must allege: (i) the deprivation of a liberty or property interest; and (ii) that no due process of law was afforded to him.  See Stears v. Sheridan County Mem'l Hosp. Bd. of Trs., 491 F.3d at 1162; Steffey v. Orman, 461 F.3d at 1221("A due process claim . . . can only be maintained where there exists a constitutionally cognizable liberty or property interest with which the state has interfered.").  Lymon thus must first demonstrate a constitutionally cognizable liberty interest with which Sanchez and Hernandez interfered.

"A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies."  Estate of DiMarco v. Wyo. Dep't of Corr., 473 F.3d 1334, 1339 (10th Cir. 2007).  The States Defendants argue that "the dispositive characteristic that marks the point at which the Due Process Clause itself implies a liberty interest . . . is in fact the release from incarceration."  Motion at 19 (quoting Harper v. Young, 64 F.3d 563, 566 (10th Cir. 1995)).  In Harper v. Young, the Tenth

Circuit held that participation in a pre-parole program, which allows convicts to live and work in society, was sufficiently similar to parole or probation to merit protection by the Due Process Clause.  See 64 F.3d at 565.  Because the liberty interest was implied in Harper v. Young, the Tenth Circuit did not need to find a liberty interest that state law created.  See 64 F.3d at 564.  The Tenth Circuit stated:

> Certain liberty interests -- of which parole and probation are of greatest salience here -- inhere in the Due Process Clause and are not subject to deprivation without adherence to the strict procedural safeguards . . . .  More commonly, the liberty interests possessed by those living in prison are created, if at all, by state law.

64 F.3d at 564 (citations omitted).  "A liberty interest inherent in the Constitution arises when a prisoner has acquired a substantial, although conditional, freedom such that the loss of liberty entailed [by its revocation] is a serious deprivation requiring that the [prisoner] be accorded due process."  Harper v. Young, 64 F.3d at 566 (citation omitted).  There are no allegations in the Second Amended Complaint that Lymon had acquired a freedom, such as parole or something similar, of which he was deprived.  Because Lymon does not allege that he has been deprived of an inherent liberty interest, the Court must determine whether Lymon has alleged a deprivation of a state-created liberty interest.

"States may under certain circumstances create liberty interests which are protected by the Due Process Clause."  Sandin v. Conner, 515 U.S. at 483-84.  But those

> interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless, imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

515 U.S. at 484.  Prison administrators are afforded broad deference in their adoption and execution of policies and practices necessary, in their judgment, to maintain institutional security. See Bell v. Wolfish, 441 U.S. 520, 547-48 (1979).  Lymon does not specifically identify any state

-49-

law giving him a liberty interest in protection from corrections officers ordering him to work in the prison kitchen or protection from orders in contravention of a medical order. In Cordova v. LeMaster, the Supreme Court of New Mexico looked to the NMDOC's policies to see if they conferred a liberty interest in spousal visitation rights. See 136 N.M. at 223, 96 P.3d at 784. The Supreme Court of New Mexico found that regulations existed that limited the discretion of prison officials to bar visitation. See 136 N.M. at 223, 96 P.3d at 784. Although Lymon has not pointed the Court to any such regulations that confer a liberty right in protection from labor orders, the Court carefully reviewed the NMDOC's policies[9] and has found no regulation which would give rise to an inmate having a liberty interest in his labor assignment. See West v. Higgins, 346 Fed. Appx. 423, 426 (11th Cir. 2009)("An inmate has no liberty interest in a particular classification, prison assignment, or transfer even if the inmate loses access to rehabilitative programs and experiences more burdensome conditions than before."); James v. Quinlan, 866 F.2d 627, 629-30 (3d Cir. 1989)(holding that inmates do not possess a liberty interest in prison job assignments)(cited favorably in Davis v. Wiley, 260 Fed. Appx. 66, 69 (10th Cir. 2008)); Jackson v. Cain, 864 F.2d 1235, 1250 (5th Cir. 1989)(finding that prison inmates have no constitutionally protected liberty interest in their job assignments). To the extent that Lymon alleges that his liberty interest arises out of the Corrections Industries Act, the Court disagrees. The Corrections Industries Act's plain language covers labor in enterprises and public works, and excepts labor in "standard facility maintenance activities and services." NMSA 1978, § 33-8-2C. The Court believes that work in the prison kitchen is not within the scope of "enterprise" -- a manufacturing, agricultural or service operation not including standard facility maintenance or services -- nor "public works"

_____

[9] The policies are publicly available at http://corrections.state.nm.us/policies/policyir.html.

-50-

-- i.e., construction, maintenance, and improvement of state and local roads and buildings -- and thus the Act does not apply to Lymon's prison kitchen assignment.  NMSA 1978, § 33-8-2.  Even if the Corrections Industries Act applied to standard facility work in the prison kitchen, it mandates inmate labor rather than protects inmates from labor.  See NMSA 1978, § 33-8-4 ("All persons convicted of crime and confined in a facility . . . shall perform labor under such rules and regulations as have been or may hereafter be prescribed by the department.").  Thus, no liberty interest arises out of the Corrections Industries Act.  Because Lymon's Second Amended Complaint has not alleged a valid constitutionally protected liberty interest warranting due-process protection, the Court will dismiss Lymon's procedural due-process claim in Count V.

### B.   LYMON'S ALLEGATIONS AGAINST SANCHEZ AND HERNANDEZ DO NOT MEET THE SHOCK-THE-CONSCIENCE STANDARD.

In his response, Lymon argues that he has claimed substantive due-process violations against Sanchez and Hernandez under the danger-creation doctrine.  See Response at 10.  The Due Process Clause protects against "deliberate wrongful government decisions rather than merely negligent government conduct."  Uhlrig v. Harder, 64 F.3d at 573.  The danger-creation theory provides that a state may be liable for an individual's safety if it created the danger that harmed the individual.  See Christianson v. City of Tulsa, 332 F.3d at 1280.  The exception applies, however, only when "a state actor affirmatively acts to create, or increases a plaintiff[']s vulnerability to, danger from private violence."  Currier v. Doran, 242 F.3d at 923.  To state a substantive due-process claim based upon the danger-creation theory, Lymon must demonstrate that: (i) the State Defendants created the danger or increased Lymon's vulnerability to the danger in some way; (ii) Lymon was a member of a limited and specifically definable group; (iii) the State Defendants' conduct put Lymon at substantial risk of serious, immediate, and proximate harm; (iv) the risk was obvious or known;

(v) the State Defendants acted recklessly in conscious disregard of that risk; and (vi) such conduct, when viewed in total, shocks the conscience.  See Ruiz v. McDonnell, 299 F.3d 1173, 1182-83 (10th Cir. 2002).  Even if Lymon alleges sufficient affirmative conduct, "the ultimate measure of whether conduct by state actors violates due process is whether 'the challenged government action 'shocks the conscience' of federal judges.'"  Marino v. Mayger, 118 Fed. Appx. 393, 402 (10th Cir. 2004)(quoting Ruiz v. McDonnell, 299 F.3d at 1183).  In assessing whether conduct shocks the court's conscience, it considers: (i) the need for restraint in defining the scope of substantive due-process claims; (ii) the concern that § 1983 not replace state tort law; and (iii) the need for deference to local policymaking bodies in making decisions impacting public safety.  See Ruiz v. McDonnell, 299 F.3d at 1184. "These factors counsel that application of danger creation as a basis for § 1983 claims is reserved for exceptional circumstances."  299 F.3d at 1184 (citation and quotation omitted).  The Tenth Circuit has noted that "ordinary negligence does not shock the conscience, and that even permitting unreasonable risks to continue is not necessarily conscience shocking[.]  Rather, a plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  299 F.3d at 1184 (quotations and citations omitted).

In Street v. Curry Board of County Commissioners, No. CIV 06-0776, 2008 U.S. Dist. LEXIS 42131 (D.N.M. Jan. 30, 2008)(Browning, J.), the plaintiff, a female inmate in the Curry County Detention Center, wished to amend her claims to allege that the County violated her substantive due-process rights when it failed to classify female inmates into separate groups based on supervision needed -- minimum, medium, maximum -- in the same manner that the male prisoners are classified, and thus exposed her to another inmate who attacked her.  The Court did not permit the addition of the claim, finding that such a claim would be futile because "[t]he Court

[did] not believe that the County's classification methods shock[ed] the conscience of federal courts." 2008 U.S. Dist. LEXIS 42131, at *41. Similarly, the Court does not believe that any of the allegations in Lymon's Second Amended Complaint, if taken as true, are egregious enough to qualify as shocking to the judicial conscience. Misclassification and denial of a grievance process do not rise to a degree of outrageousness, or a magnitude of potential or actual harm, that is truly conscience-shocking. Because the Court finds that the Sanchez' and Hernandez' conduct, if taken as true, fails to shocks the conscience of the Court, Lymon has failed to state substantive due-process claims. See Ruiz v. McDonnell, 299 F.3d at 1182-83. As Lymon has failed to state either procedural or substantive due-process violations, the Court will dismiss Count V.

## II.   THE COURT WILL DISMISS COUNTS VII AND VIII BECAUSE LYMON FAILS TO STATE A CLAIM UPON WHICH CONSTITUTIONAL RELIEF CAN BE GRANTED.

In Counts VII and VIII, Lymon asserts § 1983 claims for violations of the Fourteenth Amendment against Williams and the NMDOC. In Count VII, he alleges that Williams' conduct "exhibited a custom, unwritten policy or usage of having his department ignore the substandard food/kitchen service provided by Aramark Corporation." Second Am. Complaint ¶ 52, at 13. He asserts that he seeks prospective legal relief prohibiting "placing inmates with known transmissible diseases on work duty in the prison kitchen." Second Am. Complaint ¶ 52, at 13. Lymon further alleges that, by proving no system of oversight for the quality of services in the kitchen, Williams' conduct shocked the conscience. See Second Am. Complaint ¶ 55, at 13. In Count VIII, Lymon alleges that the NMDOC "had a custom, usage or policy of allowing classification officers wide spread freedom in the placement of inmates irrespective of doctors [sic] orders or the peculiar circumstances of a work place environment." Second Am. Complaint ¶ 58, at 14. He asserts that he seeks prospective relief "enjoining the Corrections Department from placing inmates with known

infectious diseases such as tuberculosis and other transmissible diseases from working in the prison kitchen." Second Am. Complaint ¶ 58, at 14.  Lymon further alleges that the NMDOC failed to train corrections officers about how to deal with healthcare issues concerning personnel who work around food preparation.  See Second Am. Complaint ¶ 59, at 14.

The State Defendants argue that the Court should dismiss Counts VII and VIII because Lymon fails to state a claim upon which relief can be granted.  See Motion at 22.  The State Defendants contend that Lymon does not allege in his Second Amended Complaint that he suffered any injury from substandard food or kitchen services, nor does he allege any injury related to a transmissible disease.  See Motion at 22.  The State Defendants further argue that Lymon lacks standing and that the Court should not adjudicate claims of generalized grievances.  See Motion at 23-25.  In response, Lymon argues that his affidavit states that he has hepatitis C and thus he has an injury.  See Affidavit of Davon Lymon ¶ 5, at 2 (executed July 22, 2009), filed July 24, 2009 (Doc. 48).

First, the Court will not consider Lymon's affidavit as part of its decision on the motion to dismiss.[10]  In considering a motion to dismiss pursuant to rule 12(b)(6), it is improper for the Court

---

[10] Mr. Brown stated at the hearing that the affidavit was an exhibit to the Second Amended Complaint and that, because he had technical difficulties filing it, the affidavit appears with a separate docket number.

> MR. BROWN: The reason document 48 stands by itself is that when it was placed in the system the computer took the Complaint, the amended Complaint, and document 48 was, how shall we say, an attachment but it was done in the middle of the night and we had to go and that's why it stands independent.

Tr. at 69:1-5 (Brown).  The docket does not, however, support Mr. Brown's representation to the Court.  The Second Amended Complaint was filed on December 14, 2009 (Doc. 69).  No affidavit follows the filing of the Second Amended Complaint.  Lymon filed an affidavit on July 24, 2009, following the filing of his motion for reconsideration, which appears to be in support of his motion.  See Affidavit of Davon Lymon (executed July 22, 2009), filed July 24, 2009 (Doc. 48).  Because

-54-

to consider materials from outside of the pleadings.  To consider such evidence, the Court must convert the motion to dismiss into a motion for summary judgment.  See Christensen v. Big Horn County Bd. of County Comm'rs, 2010 U.S. App. LEXIS 8746, at *12 (10th Cir. 2010)(stating "the conversion process and notice requirement are not triggered by the mere presence of outside materials, but by the court's reliance on such materials -- which are inapposite to a proper Rule 12(b)(6) disposition."); Lowe v. Town of Fairland, 143 F.3d at 1381 (stating that, even when a district court erroneously considered extraneous materials on an unconverted motion to dismiss, the Tenth Circuit must still affirm "if the dismissal can be justified under Fed. R. Civ. P. 12(b)(6) standards without consideration of the matters outside the pleadings.").  The Court declines to convert the State Defendants' motion to dismiss into a motion for summary judgment.  The material Lymon argues the Court should consider is an affidavit filed five months before the operative Second Amended Complaint was filed.  There is no indication that the affidavit is considered a part of Lymon's allegations in the Second Amended Complaint.  If Lymon wanted the Court to consider these allegations as part of his Second Amended Complaint, he should have pled them in his pleading, and not ask the Court to consider an outside document on a motion to dismiss.  Moreover, for the Court to convert the motion to dismiss into a motion for summary judgment, the State Defendants must have notice and the reasonable opportunity to present evidence.  See Fed. R. Civ. P. 12(d).  The Court has been very lenient with Lymon and generous with leave to amend, and it is time to bring the pleadings to a close so the parties can proceed to discovery and substantive motions.  The Court, within the scope of its broad discretion, will not accept materials

---

the operative complaint is the Second Amended Complaint, filed December 14, 2009, and there are no exhibits attached or filed subsequent to the Second Amended Complaint, the Court will not consider the affidavit to be an exhibit to the Second Amended Complaint.

beyond the pleadings and will not convert the State Defendants' motion to dismiss into a motion for summary judgment.  See Lowe v. Town of Fairland, 143 F.3d at 1381 ("[C]ourts have broad discretion in determining whether or not to accept materials beyond the pleadings.").  The Court thus will consider only the information contained in Lymon's Second Amended Complaint.

There are no allegations anywhere in Lymon's Second Amended Complaint that he contracted a disease -- Hepatitis C or any other disease -- working in the prison kitchen, nor are there any allegations that he suffered injury from substandard food or the conditions in the kitchen. Rather, Lymon alleges that he suffered a shoulder injury when he had to do heavy-lifting in the kitchen, in contravention of his medical restrictions.  In Swoboda v. Dubach, 992 F.2d 286, 289 (10th Cir. 1993), the Tenth Circuit found that an inmate failed to state claims upon which relief could be granted, explaining:

> Many of Swoboda's contentions about the conditions at Doniphan County jail are simply general observations or complaints on behalf of other prisoners.  He stated no specific facts connecting the allegedly unconstitutional conditions with his own experiences at Doniphan, or indicating how the conditions caused him injury. Without such facts, these claims are little more than conclusory allegations, which are insufficient to state a claim for relief.  See Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).  Additionally, Swoboda lacks standing to bring claims on behalf of others.  See Reynoldson v. Shillinger, 907 F.2d 124, 125 (10th Cir. 1990).

Swoboda v. Dubach, 992 F.2d at 289.  Like in Swoboda v. Dubach, Lymon's allegations in Counts VII and VIII attempt to allege unconstitutional conditions, but he fails to allege any actual injury he has suffered because of these conditions.  Lymon has thus failed to allege sufficient facts to establish his claims for relief in Counts VII and VIII.  Moreover, Lymon lacks standing to bring claims against Williams and the NMDOC for constitutional violations alleging improper oversight of kitchen conditions and Aramark's food services when he has not alleged that he suffered any "actual or threatened injury as a result of the putatively illegal conduct" alleged in Counts VII and

VIII.  Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979)("A plaintiff must always have suffered a distinct and palpable injury to himself, that is likely to be redressed if the requested relief is granted.")(internal citation and quotation omitted).  Lymon's Second Amended Complaint also states: "One area where Plaintiff seeks prospective legal relief is the prohibition of placing inmates with known transmissible diseases on work duty in the prison kitchen,"  Second Am. Complaint ¶ 52, at 13, and states: "Plaintiff seeks prospective relief, enjoining the Corrections Department from placing inmates with known infectious diseases such as tuberculosis and other transmissible diseases  from working in the prison kitchens," Second Am. Complaint ¶ 58, at 14. To the extent that Lymon makes allegations for prospective relief, "[a]llegations of possible future injury do not satisfy the injury in fact requirement." Initiative and Referendum Institute v. Walker, 450 F.3d 1082, 1087 (10th Cir. 2006)(internal quotations and citations omitted).  Because Lymon fails to state claims upon which relief can be granted, the Court will dismiss Counts VII and VIII.

**III.    LYMON'S FACTS DO NOT SUPPORT A CLAIM FOR DISCRIMINATION UNDER 42 U.S.C. § 1981.**

In Count VI, Lymon states that he is an African-American and alleges that "several contractual relationships" existed among the various actors described in the Second Amended Complaint: (i) a written contract between Aramark Corporation and the NMDOC; and (ii) an oral contract between Lymon and Aramark Corporation.  Second Am. Complaint ¶¶ 45-46, at 12. To establish a prima-facie case of discrimination under § 1981, Lymon must allege: (i) that he is a member of a protected class; (ii) that the State Defendants intended to discriminate against him on the basis of race; and (iii) that the discrimination interfered with a protected activity as defined in § 1981.  See Hampton v. Dillard Department Stores, Inc., 247 F.3d at 1101-02.  Section 1981 provides that all persons shall have the same right to "make and enforce contracts," and the right to

"the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

42 U.S.C. § 1981(a)-(b).  "A claim for interference with the right to make and enforce a contract must allege the actual loss of a contract interest, not merely the possible loss of future contract opportunities."  Hampton v. Dillard Dep't Stores, Inc., 247 F.3d at 1104 (citation omitted).

Even though pleadings at the motion to dismiss stage are liberally construed, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Bixler v. Foster, 596 F.3d 751, 756 (10th Cir. 2010).  Lymon alleges that he had an oral contract with Aramark to work in the prison kitchen.  Lymon argues that evidence of his contractual relationship with Aramark was the work that he did for Aramark, which it accepted, and for which it provided him remuneration.  He also alleges that he was discriminated against because of his race -- African-American.  Even if a contract existed between Lymon and Aramark, Lymon must allege sufficient facts to establish a prima-facie case of discrimination under § 1981.  Lymon alleges that he is a member of a protected class, and he also alleges that Sanchez' actions show his "racist animus toward Plaintiff."  Second Am. Complaint ¶ 49.  Lymon, however, has not alleged sufficient facts to establish the third element of § 1981 discrimination -- that it interfered with his right to make and enforce a contract.  Under Tenth Circuit law, he must allege actual loss of a contract interest -- here, the actual loss would be no longer working for Aramark.  Lymon's Second Amended Complaint, however, alleges that when Sanchez "over-ruled the doctors [sic] orders and the nurse's note prohibiting heavy lifting by Plaintiff, he terminated the contract" between Aramark and Lymon.  See Second Am. Complaint ¶ 46.  Lymon's response to the motion makes no argument addressing how Sanchez' actions -- classifying Lymon to work in the kitchen, which led to Lymon forming the alleged oral contract with Aramark to work in the kitchen -- interfered with his right to make and enforce a contract, or caused actual loss of a contract interest.  See Hampton v. Dillard

-58-

Dep't Stores, Inc., 247 F.3d at 1104.  Lymon's allegations do not support a prima-facie claim of

discrimination under § 1981 under Tenth Circuit law, and therefore the Court will dismiss Count VI

against the State Defendants.[11]

## IV.   THE COURT WILL DISMISS COUNT XIII BECAUSE IT IS WELL-ESTABLISHED LAW THAT THE STATE HAS THE AUTHORITY TO IMPOSE INVOLUNTARY SERVITUDE AS A PUNISHMENT FOR CRIME.

In Count XIII, Lymon alleges a § 1983 claim against the State Defendants for violating the

Thirteenth Amendment by forcing Lymon to work in the prison kitchen.  See Second Am.

Complaint ¶ 77, at 18.  Lymon's claim fails as a matter of law.  It is well-established that forcing

an inmate to do labor as part of his incarceration for a crime is not involuntary servitude in violation

of the Thirteenth Amendment.  See Tracy v. Keating, 42 Fed. Appx. 113, 116 (10th Cir. 2002)

("[B]y its express language, the Thirteenth Amendment's prohibition of slavery does not apply to

the imprisonment of a person lawfully convicted of a crime."); Bowen v. Quarterman,

339 Fed. Appx. at 481 (rejecting the inmate's argument that prison officials forced him to perform

labor in violation of the Thirteenth Amendment "because requiring an inmate to perform labor is

not involuntary servitude under the Amendment."); O'Connell v. Johnson, 245 Fed. Appx. at 194

("O'Connell was a duly convicted prisoner during the time period at issue and his claim under the

Thirteenth Amendment fails."); Piatt v. MacDougall, 773 F.2d at 1035 ("The Thirteenth Amendment

does not prohibit involuntary servitude as part of imprisonment for a crime.").  In his response,

Lymon cites no legal authority to contradict this weight of legal authority.[12]  The Court finds that

---

[11] Lymon's Second Amended Complaint asserts only that Sanchez acted with a racial animus against him.  See Second Am. Complaint ¶ 49, at 12.  There are no allegations against any of the other State Defendants in Count VI of the Second Amended Complaint.

[12] Lymon quotes a speech from United States Senator Charles Sumner delivered in 1856 and also quotes passages from Alexander Tsesis' book The Thirteenth Amendment and American

Lymon's Thirteenth Amendment claim fails and therefore the Court will dismiss Count XIII against the State Defendants.

## V.     THE COURT WILL DISMISS COUNT XIV BECAUSE LYMON FAILS TO STATE A CLAIM FOR WHICH THE COURT CAN GRANT RELIEF.

In Count XIV of the Second Amended Complaint, Lymon alleges that Sanchez' classification of prisoners "represent a threat to public health" because he was classifying prisoners "with obvious infectious diseases to work in the prison kitchen."  Second Am. Complaint ¶ 82, at 19. The State Defendants argue that Lymon fails to state a claim upon which relief can be granted, as there is no claim that Sanchez' classification of Lymon or anyone else impacted anyone outside of the prison.  See Motion at 26.  They further contend that Lymon lacks standing because he did not personally suffer the alleged injury -- contracting an infections disease -- as a result of Sanchez' classification.  See Motion at 26.  Lymon's response makes no attempt to rebut the State Defendants' arguments.  As the Court found when addressing Lymon's claims in Count VII and Count VIII, nowhere in Lymon's Second Amended Complaint is there an allegation that Lymon contracted an infectious disease as a result of Sanchez' classification, or as a result of the other State Defendants' actions.  Lymon lacks standing to bring a claim -- that Sanchez' classifications of prisoners represent a threat to public health -- when he has not alleged that he suffered any "actual or threatened injury as a result of the putatively illegal conduct" alleged in Count XIV. See Gladstone, Realtors v. Village of Bellwood, 441 U.S. at 99 ("A plaintiff must always have suffered a distinct and palpable injury to himself, that is likely to be redressed if the requested relief is granted.")(internal citation and quotation omitted); Raiser v. United States, 325 F.3d 1182, 1184

---

Freedom.  See Response at 4, 5, 11.  Not only are these not legal authority, but Lymon fails to offer any analysis of how such citations are relevant to his claims.

(10th Cir. 2002)(stating that a "generalized grievance, without any imminent tangible harm, cannot confer standing."); <u>Citizens' Comm. to Save Our Canyons v. United States Forest Sev.</u>, 297 F.3d 1012, 1026 (10th Cir. 2002)(stating that "a plaintiff cannot assert a generalized grievance shared in substantially equal measure by all or a large class of citizens.")(internal quotations and citation omitted).   Moreover, no well-pled facts support Lymon's conclusory statement that Sanchez' classifications represent a threat to public health.   A complaint does not "suffice if it tenders naked assertions devoid of further factual enhancement." <u>Ashcroft v. Iqbal</u>, 129 S. Ct. at 1949 (internal alterations, citations, and quotations omitted).   Lymon alleges: "The immunization of classification decisions by John Sanchez which harm one inmate from legal action is also violative of federal policy."   Second Am. Complaint ¶ 83, at 19.   While there may be federal policies for all sorts of things in society -- good health, full employment, happiness -- the legal issue is whether a person can bring a suit in federal court to establish a right to these goals and for which Congress has created a cause of action to secure these rights judicially.   The Court finds that Lymon's allegations in Count XIV fail to state a claim upon which relief can be granted, and that Lymon lacks standing to bring a claim, if one existed, when he has not alleged in his Second Amended Complaint that he suffered a distinct and palpable injury.   The Court therefore dismisses Count XIV.

As the Court finds that Lymon has failed to assert federal constitutional claims against the State Defendants upon which relief can be granted, and is dismissing all claims asserted against them pursuant to rule 12(b)(6), the State Defendants also enjoy the protection that the qualified immunity affirmative defense affords.   Lymon's claims fail both prongs of his two-prong burden to defeat qualified immunity because he has not established that the State Defendants' actions violated his constitutional rights.   <u>See</u> <u>Riggins v. Goodman</u>, 572 F.3d at 1107.

**VI.   THE COURT WILL DISMISS COUNTS I AND II BECAUSE THE ALLEGATIONS IN SUPPORT OF LYMON'S TORT CLAIMS AGAINST SANCHEZ AND HERNANDEZ FALL OUTSIDE THE NMTCA'S WAIVERS OF IMMUNITY FOR STATE EMPLOYEES.**

The State Defendants argue that the Court should dismiss Counts I and II, asserted against Sanchez and Hernandez respectively, because the claims of negligence under the NMTCA asserted against them fall outside of the waivers of immunity set forth in the NMTCA.  Lymon does not dispute that Sanchez and Hernandez are public employees acting within the scope of their duties, and thus "[c]onsent to be sued may not be implied but must come within one of the exceptions to immunity under the Tort Claims Act."  Begay v. State, 104 N.M. at 486-87, 723 P.2d at 255-56.  If no specific waiver can be found in the NMTCA, the Court must dismiss Lymon's NMTCA claims. See Begay v. State, 104 N.M. at 486-87, 723 P.2d at 255-56.  "The areas for which immunity is waived in the Tort Claims Act are quite specific."  Luboyeski v. Hill, 117 N.M. 380, 383, 872 P.2d 353, 356 (1994)(citing § 41-4-6 (waiver of immunity for negligence of public employees acting within scope of employment in operation or maintenance of buildings, public parks, machines, or equipment), § 41-4-7 (operation of airports), 41-4-9 (medical facilities), § 41-4-10 (health care providers), § 41-4-11 (highways and streets)).  Lymon argues that Sanchez and Hernandez fall within the waivers in § 41-4-6 and § 41-4-12.

**A.   LYMON'S ALLEGATIONS OF NEGLIGENT CLASSIFICATION AGAINST SANCHEZ FALL OUTSIDE § 41-4-6's WAIVER.**

In Count I of the Second Amended Complaint, Lymon alleges that Sanchez negligently misclassified him for work in the prison kitchen contrary to his medically ordered restriction prohibiting heavy lifting.  See Second Am. Complaint ¶¶ 10, 21-24, at 3, 5.  While other legal claims are made against Sanchez in the Second Amended Complaint, Lymon's claim of negligence against Sanchez is based only on the alleged misclassification.

Section 41-4-6 exempts from immunity "liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment, or furnishings."  NMSA 1978, § 41-4-6.  This waiver "contemplates waiver of immunity where due to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective condition on property owned and operated by the government." Bober v. N.M. State Fair, 111 N.M. at 653, 808 P.2d at 623.  The Supreme Court of New Mexico has addressed whether the negligent classification of a prison inmate falls within § 41-4-6's scope and has held that "Section 41-4-6 does not waive immunity when public employees negligently perform such administrative functions."  Archibeque v. Moya, 116 N.M. at 619, 866 P.2d at 347. In Archibeque v. Moya, the Supreme Court of New Mexico found: "The 'operation' and 'maintenance' of the penitentiary premises, as these terms are used in Section 41-4-6, does not include the security, custody, and classification of inmates."  116 N.M. at 619, P.2d at 347.  As in the circumstances in Archibeque v. Moya, Lymon alleges that Sanchez' misclassification of him caused him injury.  The Court finds the Supreme Court of New Mexico's holding that § 41-4-6's waiver of immunity does not apply to negligent classification of an inmate to be on point in this case.

Lymon argues that the Court should follow the dicta of a footnote in Archibeque v. Moya, which states: "While a segment of the population at risk might justify a waiver of immunity under Section 41-4-6, a situation in which a single inmate is put at risk is not comparable."  116 N.M. at 621 n.3, 866 P.2d at 349 n.3.  Chief Justice Ransom, in his concurrence, elaborated on the significance between a "discrete administrative decision," which does not waive immunity, and "a general condition of unreasonable risk from negligent security practices," which could waive

immunity.  116 N.M. at 622, 866 P.2d at 350 (Ransom, C.J. concurring).  Chief Justice Ransom stated that the classification of Archibeque did not change the condition of the premises, and that Archibeque's injuries did not arise from a condition of the premises, but from the classification itself.  See id. at 622, 866 P.2d at 350.  Lymon argues that he pled in his Second Amended Complaint that Sanchez misclassified hundreds of inmates.  See Response at 2; Second Am. Complaint ¶ 10, at 3 ("Sanchez has done this [misclassification] to hundreds of men in the prison."); Second Am. Complaint ¶ 22, at 5 ("John Sanchez has negligently misclassified other inmates with medical conditions creating a danger for the inmate population.").  The Court, however, does not believe that Lymon's factual allegation that others have been misclassified and his conclusory allegation that it creates a danger for the inmate population is sufficient to support finding a waiver under § 41-4-6.  To come within Chief Justice Ransom's footnote, this misclassification must raise security risks, not health risks.  Security is not at issue here.  The Court is reluctant to expand Chief Justice Ransom's possible exception to other areas beyond prison security.  It appears best to take the majority in Archibeque v. Moya at its word -- "Section 41-4-6 does not include the . . . classification of inmates" -- rather than find the footnote creates an exception that New Mexico courts have not yet recognized.  Moreover, the decision in Archibeque v. Moya is seventeen years old, and the New Mexico Legislature has not statutorily overruled it.

Second, Lymon does not allege that Sanchez' alleged misclassifications have injured any other inmate besides Lymon.  While the he alleges the misclassifications created a "danger," no injury is alleged from the alleged danger with respect to others.  Under rule 12(b)(6), a motion to dismiss "admits all well-pleaded facts in the complaint as distinguished from conclusory allegations."  Mitchell v. King, 537 F.2d at 386 (citation omitted).  The Court does not believe that Lymon's threadbare allegations that other inmates were misclassified rises to a level of "a dangerous

condition on the premises of the penitentiary," <u>Callaway v. N.M. Dep't of Corr.</u>, 117 N.M. at 643, 875 P.2d at 399, and thus does not believe that Lymon's claim is one which "might justify waiver of immunity under § 41-4-6."  116 N.M. at 621 n.3, 866 P.2d at 349 n.3.  In <u>Callaway v. New Mexico Department of Corrections</u>, roving gang members in the recreation area created a dangerous condition on the premises of the prison.  117 N.M. at 643, 875 P.2d at 399.  Sanchez' alleged misclassifications do not rise to the level of a dangerous condition on the prison premises found in <u>Callaway v. New Mexico Department of Corrections</u>.  The well-pleaded factual allegations support only a claim against Sanchez for negligent classification of Lymon which resulted in injury and such a negligently performed administrative task does not waive Sanchez' immunity.  <u>See</u> <u>Archibeque v. Moya</u>, 116 N.M. at 619, 866 P.2d at 347.  To find otherwise would go against the Supreme Court of New Mexico's finding that holding a corrections officer liable for negligent classification of an inmate resulting in injury "would undermine the purposes of the Tort Claims Act by subjecting the State to liability for virtually any mistake made during the administration of corrections facilities that results in injury to an inmate."  <u>Archibeque v. Moya</u>, 116 N.M. at 621, 866 P.2d at 349.  The Court, therefore, will not waive Sanchez' immunity under § 41-4-6.

### B.   LYMON'S ALLEGATION OF NEGLIGENCE AGAINST HERNANDEZ FALL OUTSIDE § 41-4-6's WAIVER.

In Count II, Lymon alleges that Hernandez denied Lymon the use of the prison grievance process, and that such action "constitutes a negligent action in maintaining and operating the prison's physical premises because it maintains a certain policy."  Second Am. Complaint ¶ 28, at 6.  He alleges that, "[b]y denying Plaintiff the opportunity for a Hearing, Abner Hernandez maintained a policy which affects a whole segment of inmates."  Second Am. Complaint ¶ 28, at 6.  The State Defendants argue that § 41-4-6 is inapplicable to Lymon's claim that Hernandez

negligently denied him access to the grievance process because the prison grievance process is an administrative procedure, and the grant or denial of its use is an administrative function. See Motion at 9. Lymon did not respond to the State Defendants' argument in his brief, stating only that "Plaintiff states the actions of officer Hernandez interfered with his ability to Exhaust his Administrative Remedies with the law, the Department of Corrections and the Court." Response at 11. At the hearing, Mr. Brown argued that § 41-4-6's purpose is to protect the public and that therefore Hernandez' action in refusing to permit Lymon to use the formal grievance process make him liable under the waiver in § 41-4-6. Even taking the factual allegations in Count II of the Second Amended Complaint as true, the Court agrees with the State Defendants -- and Lymon has not rebutted their argument -- that Hernandez' denial of Lymon's use of the formal grievance process was negligent performance of an administrative function. Hernandez made a discrete administrative decision to forbid Lymon from filing a grievance and, taking Lymon's allegation as true, that decision caused him injury. See Archibeque v. Moya, 116 N.M. at 622, 866 P.2d at 350 (Ransom, C.J., concurring)("I see Archibeque's injuries as having been proximately caused by a discrete administrative decision."). The Court, therefore, finds that Hernandez' negligent performance of an administrative function -- denial of a grievance -- does not waive immunity under § 41-4-6. See Archibeque v. Moya, 116 N.M. at 619, 866 P.2d at 347 ("To read Section 41-4-6 as waiving immunity for negligent performance of administrative functions would be contrary to the plain language and intended purpose of the statute.").

### C. SANCHEZ AND HERNANDEZ ARE NOT LAW-ENFORCEMENT OFFICERS WITHIN THE SCOPE OF § 41-4-12'S WAIVER OF IMMUNITY.

Lymon argues, in the alternative, that Sanchez and Hernandez are law-enforcement officers and the waiver of immunity in § 41-4-12 applies. Section 41-4-12 provides a waiver of immunity

-66-

for law-enforcement officers who have committed certain torts.  See Oliveros v. Mitchell, 449 F.3d

at 1096.

> [I]n order to state a tort claim under the waiver of immunity set out in
> Section 41-4-12, a plaintiff must demonstrate that the defendants were law
> enforcement officers acting within the scope of their duties, and that the plaintiff's
> injuries arose out of either a tort enumerated in this section or a deprivation of a right
> secured by law.

Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 121 N.M. at 649, 916 P.2d at 1316.

The NMTCA defines "law enforcement officer" as "any full-time salaried public employee

of a governmental entity whose principal duties under law are to hold in custody any person accused

of a criminal offense, to maintain public order or to make arrests for crimes, or members of the

national guard when called to active duty by the governor."  NMSA, 1978, § 41-4-3D.  In Callaway

v. New Mexico Department of Corrections, the New Mexico Court of Appeals affirmed the trial

court's determination that corrections officers are not law-enforcement officers under § 41-4-3D.

See 117 N.M. at 641, 875 P.2d at 397.  The New Mexico Court of Appeals found persuasive the

holding of the Honorable Santiago E. Campos, United States District Judge, in Osborn v. Governor

of New Mexico, Civ. No. 80-178 (D.N.M. 1983)(Campos, J.), in which Judge Campos held that

prison guards in the department of corrections are not law-enforcement officers for purposes of

§ 41-4-3D because: (i) the principal duties of prison guards are to hold in custody persons who have

already been convicted rather than merely accused of a criminal offense; (ii) maintenance of public

order relates to a public not a penitentiary setting; and (iii) although prison guards may have the

supplemental power to arrest pursuant to the guidelines of § 33-1-10, their principal statutory duties

are those set forth in § 33-2-15.  See Callaway v. New Mexico Dep't of Corr., 117 N.M. at 641, 875

P.2d at 397 (discussing Osborn v. Governor of N.M., Civ. No. 80-178, slip. op.), cert. denied, 118

N.M. 90, 879 P.2d 91 (1994).[13]

The Supreme Court of New Mexico in <u>State v. Young</u>, 135 N.M. 458,90 P.3d 477 (2004), noted in a footnote that it has found that jailers at county jails are law-enforcement officers within the meaning of § 41-4-3D and declined to address any "potential conflict in the cases interpreting Section 41-4-3(D)."  135 N.M. at 467 n.2, 90 P.3d at 486 n.2.  There is a distinction, however, between officers holding, in the plain language of § 41-4-3D, "in custody any persons accused of a criminal offense" and those officers who are holding in custody persons already convicted.  The Court believes that the reasoning of Judge Campos, which the New Mexico Court of Appeals adopted, remains sound.  The cases finding jailers to be law-enforcement officers are distinguishable from the cases that have found that corrections officers are not law-enforcement officers.  The former have found that persons in charge of inmates accused of crimes and awaiting trial, which fits within the plain language of § 41-4-3D, are different from corrections officers, who manage persons already convicted and sentenced.  <u>See</u> <u>Davis v. Bd. of County Comm'rs</u>, 127 N.M. 785, 796, 987 P.2d 1172, 1183 (Ct. App. 1999)("It is settled New Mexico law that directors of a county detention center, in which the inmates are primarily accused of a criminal offense and awaiting trial, fall within the definition of law enforcement officers under the Act.")(quotation omitted); <u>Abalos v. Bernalillo County Dist. Attorney's Office</u>, 105 N.M. 554, 560, 734 P.2d 794, 800 (Ct. App. 1987)

---

[13] Section 33-2-15 provides:

> The employees of the penitentiary shall perform such duties in the charge and oversight of the penitentiary, care of the property belonging thereto, and in the custody, government, employment and discipline of the convicts as shall be required of them by the corrections division [corrections department] or the warden, in conformity with law and rules and regulations prescribed for the government of the penitentiary.

NMSA 1978, § 33-2-15.

("We hold as a matter of law that the director [of the Bernalillo County Detention Center's] duties are principally to hold in custody persons accused of a criminal offense.").  Compare Callaway v. N.M. Dep't of Corr., 117 N.M. at 641, 875 P.2d at 397 (holding that corrections officers who hold convicted persons in custody are not law-enforcement officers under § 41-4-3D); Anchondo v. Corr. Dep't, 100 N.M. at 111, 666 P.2d at 1258 (stating that "[t]he fact that a person is employed at the penitentiary is not sufficient to establish that his job is one in law enforcement," and holding that the Warden and the Secretary of Corrections are not law-enforcement officers under § 41-4-3 because the majority of their time is devoted to administrative duties and they have no authority to make arrests for crimes).  There are rational reasons that the New Mexico Legislature has made a distinction between detention officers and prison guards.  For those citizens presumed innocent or still only accused, the Legislature was willing to waive immunity for certain torts; for those already convicted of crimes, the Legislature was not willing to waive immunity.  The Legislature could have drawn the line differently, but there is nothing irrational or unsound with its policy decision.  Moreover, Judge Campos' opinion in Osborn v. Governor of New Mexico and the New Mexico Court of Appeals' decision in Callaway v. New Mexico Department of Corrections have been around for twenty-seven years and sixteen years, respectively, and the Legislature has not chosen to expand its waiver.

The Court believes that the Supreme Court of New Mexico would uphold the New Mexico Court of Appeals' holding in Callaway v. New Mexico Department of Corrections, and find that corrections officers do not fit within the plain language of § 41-4-3D, and thus that § 41-4-12 does not waive immunity.  The Court notes, however, that, even if Sanchez and Hernandez were considered law-enforcement officers, their alleged actions -- negligent classification and negligent denial of the grievance process -- are not considered within the torts listed in § 41-4-12.  The

Supreme Court of New Mexico in <u>Bober v. New Mexico State Fair</u> stated: "[N]o case has held that

simple negligence in the performance of a law enforcement officer's duty amount to commission

of one of the torts listed in [§ 41-4-12]."  111 N.M. at 653-54, 808 P.2d at 623-24.[14]  The Court,

therefore, finds that § 41-4-12 does not waive Sanchez' or Hernandez' immunity from claims under

the NMTCA.  Because Lymon's claims fall outside of the scope of the waivers in § 41-4-6 and

§ 41-4-12, and because the Court finds that none of the other waivers apply,[15] the Court will dismiss

Lymon's claims in Count I and Count II.  <u>See</u> <u>Begay v. State</u>, 104 N.M. at 487, 723 P.2d at 256.

## VII.  THE COURT WILL DISMISS COUNTS III AND IV BECAUSE THERE IS NO UNDERLYING LIABILITY ON WHICH TO IMPOSE RESPONDEAT SUPERIOR LIABILITY AGAINST WILLIAMS AND THE NMDOC, AND BECAUSE THE NEGLIGENCE ALLEGATIONS AGAINST WILLIAMS AND THE NMDOC FALL OUTSIDE THE NMTCA'S WAIVERS OF IMMUNITY.

In Count III, Lymon alleges that Williams, as Secretary of the NMDOC, is liable under a

theory of respondeat superior, and also alleges that Williams and the NMDOC were independently

negligent.  <u>See</u> Second Am. Complaint ¶¶ 31-32, 35, at 7-9.  The State Defendants argue there can

---

[14] To the extent that Lymon attempts to argue that Sanchez and Hernandez are liable for battery in his response brief, the Court finds no indication in the Second Amended Complaint that Lymon asserts any claims other than negligence in Counts I and II.  <u>See</u> Second Am. Complaint ¶ 24, at 5 (Count I)("The intentional act of placing Plaintiff in the kitchen where he might be injured was negligent and wrongful."); Second Am. Complaint ¶ 28, at 6 (Count II)("The act of denying Plaintiff a grievance, after an injury, constitutes a negligent action in maintaining and operating the prison's physical premises because it maintains a certain policy.").  <u>Compare</u> Response at 9 ("Plaintiff maintains that state defendants are responsible for the battery which led to his physical injuries.").  The Court, therefore, will not consider whether Sanchez or Hernandez are liable for a claim of battery as no such claim exists in the Second Amended Complaint.

[15] None of the waivers set forth in the NMTCA are applicable to Lymon's claims in Counts I and II.  <u>See</u> NMSA 1978, § 41-4-5 (operation or maintenance of motor vehicles, aircraft, and watercraft), NMSA 1978, § 41-4-7 (operation of airports); NMSA 1978, § 41-4-8 (operation of public utilities); NMSA 1978, § 41-4-9 (operation of medical facilities); NMSA 1978, § 41-4-10 (providing healthcare services); NMSA 1978, § 41-4-11 (construction and maintenance of streets and highways).

be no respondeat superior liability without underlying tort liability of Sanchez and Hernandez, of which there is none.  They also argue that the waivers Lymon has asserted -- § 41-4-6 and § 41-4-12 -- are not applicable to Lymon's claims against Williams and the NMDOC.

### A.   THERE IS NO UNDERLYING LIABILITY ON WHICH TO IMPOSE RESPONDEAT SUPERIOR LIABILITY AGAINST WILLIAMS OR THE NMDOC.

In Counts III and IV, Lymon alleges that Williams and the NMDOC are liable under a theory of respondeat superior for the actions of NMDOC employees Sanchez and Hernandez. "Under basic respondeat superior principles, an employer is liable for an employee's torts committed within the scope of his or her employment." Ocana v. Am. Furniture Co., 135 N.M. 539,551, 91 P.3d 58,70 (2004)(citing Los Ranchitos v. Tierre Grande, Inc., 116 N.M. 222, 226, 861 P.2d 263, 267 (Ct. App. 1993)).  In Silva v. State, 106 N.M. 472, 745 P.2d 380 (1987), the Supreme Court of New Mexico set forth what is required for a respondeat superior claim:

> To name a particular entity in an action under the Tort Claims Act requires two things: (1) a negligent public employee who meets one of the waiver exceptions under Sections 41-4-5 to -12; and (2) an entity that has immediate supervisory responsibilities over the employee.  If a public employee meets an exception to immunity, then the particular entity that supervises the employee can be named as a defendant in an action under the Tort Claims Act.

106 N.M. at 477, 861 P.2d at 385 (quoting Abalos v. Bernalillo County Dist. Attorney's Office, 105 N.M. at 559, 734 P.2d at 799).  The Court cannot properly impose respondent superior liability, because the allegedly negligent employees -- Sanchez and Hernandez -- do not meet any of the NMTCA's waiver exceptions, and therefore no underlying liability exits on which to impose such vicarious liability.  The Court, therefore, dismisses the respondeat superior claims in Count III and Count IV.

**B.     LYMON'S NEGLIGENCE CLAIMS AGAINST WILLIAMS AND THE DEPARTMENT OF CORRECTIONS ARE OUTSIDE OF § 41-4-6'S AND § 41-4-12'S SCOPE.**

Lymon alleges that Williams negligently: (i) failed to establish standards, practices, policies, and procedures to deal with medical complications which arise from the placement of inmates who are given work which exceeds the limitations ordered by their physicians; (ii) failed to select, hire, and supervise kitchen contractors like Aramark; (iii) failed to train corrections officers about how to handle prisoners who have pre-existing medical conditions and are required to do work for private contractors, where the limitations ordered by a physician restrict what the inmate can do; (iv) failed to train corrections officers concerning the importance of honoring additional medical evidence of disability; (v) failed to monitor private contractors to make certain that inmates classified to work for private contractors are provided with a safe, healthy work environment; and (vi) maintained a policy of disallowing grievance appeals where inmates are injured while working for private contractors.  See Second Am. Complaint ¶¶ 31-32, at 7-8.  In Count IV, Lymon alleges that the NMDOC is liable under a theory of respondeat superior and also alleges that the NMDOC is liable for negligently (i) failing to provide day-to-day supervision of Aramark; (ii) failing to provide a grievance procedure for the specific problem Lymon encountered; (iii) failing to have in place policies, procedures, and practices that require medical clearance before assigning inmates to work in the prison kitchen; (iv) violating the Corrections Industry Act pertaining to inmate work for private contractors; and (v) failing to require Aramark and its employees to abide by all New Mexico State laws and prison policies in dealing with inmate labor.  See Second Am. Complaint ¶ 35, at 8-9. The State Defendants argue that none of the negligent actions alleged in Counts III and IV fall within § 41-4-6's or § 41-4-12's scope.

In response to the State Defendants' argument that no waiver of immunity applies to

Lymon's negligence claims against Williams and the NMDOC, Lymon does not dispute that his claims are not within the scope of these waivers.  Rather, Lymon cites to <u>Silva v. State</u> for the proposition that "the finder of fact [will] determine whether [the Secretary of Corrections] failed to exercise ordinary care in the discharge of these duties as they may be found to include the operation or maintenance of the corrections and medical care facilities and health care services proximately related to the death of Silva," and argues that it benefits his case.  Response at 10 (quoting <u>Silva v. State</u>, 106 N.M. at 478, 861 P.2d at 386).  The Court does not believe that the quotation plucked from <u>Silva v. State</u> with no explanation as to why it applies to Lymon's claims defeats the State Defendants' argument that Lymon's claims are not within § 41-4-6's scope.  In <u>Silva v. State</u>, an inmate with serious psychiatric problems committed suicide while incarcerated, and the plaintiffs brought a wrongful death action, alleging that the negligent failure to provide Silva with special care for his condition caused his death.  <u>See</u> 106 N.M. at 473, 745 P.2d at 381.  The Supreme Court of New Mexico held that the trial court erred by concluding that the NMTCA's waivers of immunity were inapplicable to acts or omissions that the Secretary of Corrections committed while acting within the scope of his duties.  <u>See</u> 106 N.M. at 477, 745 P.2d at 385 ("We hold only that Francke's management and enforcement duties may be found to have included staffing, training and provision for facilities which would have provided Silva a course of treatment, health care and protection to address the mental disorder undergirding his basic prison classification.").  In <u>Archibeque v. Moya</u>, however, the Supreme Court of New Mexico noted that its decision in <u>Silva v. State</u> provided "no generally applicable principle pertaining to the interpretation of Section 41-4-6," and the decision in <u>Silva v. State</u> noted only that the Secretary of Correction's immunity

<i>might</i> be waived under one or more of three provisions of the Tort Claims Act:

> Section 41-4-6, Section 41-4-9 (immunity waived for negligent operation of any hospital, infirmary, mental institution, clinic dispensary, medical care home, or similar facilities) or Section 41-4-10 (immunity waived for negligent provision of health care services).

Archibeque v. Moya, 116 N.M. at 473, 866 P.2d at 349.  The Supreme Court of New Mexico in Archibeque v. Moya also noted that the decision in Silva v. State then "required the finder of fact to determine whether the Secretary breached duties related to any one of the three waiver provisions listed above following further factual development at trial." Archibeque v. Moya, 116 N.M. at 473, 866 P.2d at 349.  The Supreme Court of New Mexico explained:

> Nowhere in Silva did we determine that the Secretary's actions waived immunity under Section 41-4-6 or interpret Section 41-4-6 to waive immunity under circumstances like those presented in the case at bar.  To read Silva as a case of general applicability, standing for the proposition that Section 41-4-6 waives immunity whenever injury results from a negligently performed administrative task affecting a single inmate, would again ignore the express language and purpose of Section 41-4-6.  Moreover, to read Silva as applying generally to cases like the instant case would undermine the purpose of the Tort Claims Act by subjecting the State to liability for virtually any mistake made during the administration of corrections facilities that results in injury to an inmate. We hold that Silva must be limited to its specific facts.

Archibeque v. Moya, 116 N.M. at 473, 866 P.2d at 349.  The situation in Silva v. State is distinguishable from this case.  In that case, the issue was whether "the operation or maintenance of the corrections and medical care facilities and health care services proximately related to the death of Silva." 106 N.M. at 478, 745 P.2d at 386.  Lymon's Second Amended Complaint does not allege that the operation or maintenance of the prison kitchen or other facilities caused his injuries; he alleges that Sanchez' negligent misclassification and refusal to follow a medical order caused his injuries.  Moreover, all of Lymon's allegations of negligence against Williams and the NMDOC are claims of negligent administration of the prison.  Section 41-4-6 is not intended to waive immunity for negligent performance of administrative functions.  See Archibeque v. Moya, 116 N.M. at 471,

-74-

866 P.2d at 347 ("To read Section 41-4-6 as waiving immunity for negligent performance of administrative functions would be contrary to the plain language and intended purpose of the statute."). The Court, therefore, finds that Lymon's claims are not within the scope of § 41-4-6's waiver of immunity.

Section 41-4-12 also does not waive Williams' or the NMDOC's immunity. The Supreme Court of New Mexico has held as a matter of law that the Secretary of Corrections is not a law-enforcement officer as the NMTCA defines the phrase. See Anchondo v. Corr. Dep't, 100 N.M. at 111, 666 P.2d at 1258 ("[W]e see that neither the Secretary of Corrections nor the Warden engage in any of the traditional duties of 'law enforcement officers.' . . .  They are merely administrative officers appointed by the governor to oversee, administer, and supervise the state's corrections system."). The NMDOC is also not a law-enforcement officer within the definition set forth in § 41-4-3D. See Silva v. State, 106 N.M. at 479, 745 P.2d at 387 ("Since the [Corrections and Criminal Rehabilitation Department] is neither a public employee nor a law enforcement officer, the trial court properly dismissed plaintiffs' Tort Claims Act claim against the CCRD."); Wittkowski v. State, 103 N.M. 526, 529, 710 P.2d 93, 96 (Ct. App.)("The corrections department is not within the definition [of § 41-4-3]"), cert. quashed, 103 N.M. 446, 708 P.2d 1047 (1985), overruled on other grounds by Silva v. State, 106 N.M. at 477, 745 P.2d at 385. Because neither Williams nor the NMDOC fall within the waivers in § 41-4-6 or § 41-4-12, the Court will dismiss Lymon's claims asserted in Counts III and IV.

**IT IS ORDERED** that the State Defendants' Rule 12(b) Motion to Dismiss is granted. The Court dismisses the claims asserted against Defendants John Sanchez, Abner Hernandez, Joe Williams, and the New Mexico Department of Corrections in Counts I, II, III, IV, V, VI, VII, VIII, XIII, and XIV and dismisses those Defendants from the case.

-75-

UNITED STATES DISTRICT JUDGE

*Counsel:*

Solomon Brown
Albuquerque, New Mexico

    *Attorney for the Plaintiff*

Sean Olivas
Javier F. Junco
Keleher & McLeod, P.A.
Albuquerque, New Mexico

    *Attorney for Defendants John Sanchez, Abner Hernandez, Joe Williams,*
      *and the New Mexico Department of Corrections*

Theresa W. Parrish
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

    *Attorneys for Defendants Aramark Corporation, Joseph Neubauer,*
      *and Charlie Carrizales*

James R. Wood
Rachel Reinsvold
Miller Stratvert, P.A.
Albuquerque, New Mexico

    *Attorneys for Defendant Wexford Corporation*